2000 Utah Ct. App. 235

Karen KELLY, Petitioner,

v.

SALT LAKE CITY CIVIL SERVICE COMMISSION; and Salt Lake City Corporation, Police Department, Respondents.

No. 990530–CA.

Court of Appeals of Utah.

Aug. 3, 2000.

Carol Clawson, Snell & Wilmer, Salt Lake City, for Petitioner.

Steven W. Allred and Roger F. Cutler, Salt Lake City Law Department, Salt Lake City, for Respondents.

Before Judges BILLINGS, DAVIS, and ORME.

## OPINION

ORME, Judge:

¶ 1 Petitioner Karen Kelly seeks our review of the decision of the Salt Lake City Civil Service Commission upholding her termination by Police Chief Ruben B. Ortega from the Salt Lake City Police Department for conduct unbecoming an officer. We conclude the Commission's decision was proper.

## BACKGROUND

### a. Events Preceding Termination

¶ 2 Kelly was a police officer with the Department from September 1, 1988 until her termination on December 11, 1998. The events culminating in her termination took place in the early morning hours of November 9, 1998. She had ended her shift and arrived home at approximately 12:30 a.m. Kelly had a history of depression and difficulty sleeping and was taking Ambien, a prescription sleep aid. She was instructed to take 10 mg. of Ambien at bedtime. Instead, Kelly took 5 mg. and began watching a movie and playing video games. Half-an-hour later she took another 5 mg. and an hour after that she admits taking yet another 10 mg. All in all, Kelly was uncertain how much Ambien she had actually taken over the course of that early morning, but admits she did not go to bed.

¶ 3 Instead, between 4:32 and 5:15 a.m., Kelly, intoxicated due to the effects of Ambien, repeatedly called the police and fire dispatch centers in the Public Safety Building in Salt Lake. Kelly had dialed the center's seven-digit number, not 911, from her cellular phone while in her living room. During those calls, she refused to give her real name, referring to herself as "Sire Arthur"; she asked to speak to "Kraut Dog," her name for a dispatcher named Kim Kraus; she asked whether a dispatcher was "cute"; called some dispatchers "babes" and others "dogs"; referred to one as a "witch"; and asked one dispatcher if she was "good," apparently in a sexual sense; she told dispatch she should blow up the Public Safety Building, but only after everyone was out of the building; she refused to give her location to dispatch; she reported smelling smoke and falsely reported a fire behind her house; she told dispatch she was drinking beer and Kool Aid; and she said she was playing around until she could get Kim on the line. During these events the dispatchers told Kelly she could not just talk on the phone and stated they were busy. Dispatch also hung up on Kelly after she made the sexual innuendo. Later, after she called back and began talking about blowing up the building, they expressed concern about her desire. Although they never really took her threat very seriously, they notified the watch commander about her calls. Dispatch also talked to Kelly's roommate, who had awakened and taken the phone from Kelly at one point. Dispatch discovered Kelly's identity, and, during the conversation with her roommate, discovered, contrary to Kelly's report, that there was no fire behind her house. They were also informed Kelly had told her roommate she had taken enough Ambien to make her "feel good."

¶ 4 Ultimately, the watch commander, Lieutenant Linton, along with Sergeant Isakson, went to Kelly's home to check on her welfare and noted that no medical attention was needed to protect Kelly or others, as her intoxicated condition was improving. Linton reported the incident to Captain Neeley later that morning and an investigation was initiated and assigned to Sergeant Askerlund. Askerlund interviewed Kelly's roommate and discovered Kelly had told her roommate she had taken "9,000" Ambien tablets that night. Isakson reported to Askerlund that Kelly had slurred speech; admitted taking some sleeping pills; and lost her balance, falling into the couch in his presence.

¶ 5 Dr. Lowry, the physician who prescribed Ambien for Kelly, wrote a letter to the Department in the course of its investigation. He stated "[i]t is not unusual for patients who have taken 20 mg. of Ambien to behave in a bizarre fashion," and indicated that a very small percentage of users become inebriated by the drug. Apparently, Kelly had been prescribed 20 mg. doses previously, but was currently on a 10 mg. prescription dose. Dr. Lowry also stated he "consistently warn[ed] people that they need to be ready to go to bed and sleep without interruption

when they take [Ambien]," although he could not specifically recall so instructing Kelly.

¶ 6 Following the investigation, Chief Ortega decided to terminate Kelly. Noting Kelly's "history of sustained complaints," the Chief terminated Kelly "[b]ecause of the gravity of [her] latest misconduct, coupled with [her] employment history and the need to protect [the citizens of Salt Lake]."

### b. Employment History

¶ 7 Because the decision to terminate was based on Kelly's entire history with the Department, we must set out her previous conduct considered by the Chief in terminating her employment and considered by the Salt Lake City Civil Service Commission in upholding the termination. While Kelly's superior officers noted several positive aspects of her performance and the Commission's record contains many letters of thanks from members of the community, Kelly was also noted as having a recurring problem of being late for, or completely missing, work without prior approval. In 1992, her performance evaluation showed she had been late eleven times in seven months. In 1995, 1996, and 1997 Kelly's performance evaluations noted she took time off without prior approval and that she was often late for line-ups. In 1996 she was also counseled about appropriate use of sick time, as she had a history of taking many of her sick days just before or after long weekends. Also in 1996, Kelly had failed to appear as a prosecution witness at a preliminary hearing and the District Attorney wrote a letter to her division commander complaining that Kelly's absence had seriously prejudiced the prosecution in an important criminal case. Near the end of her employment in 1998, while assigned to the Detective Division of the Department, Kelly's supervisor noted that she lacked focus, resulting in a failure to quickly resolve her cases.

¶ 8 Kelly had also attempted suicide on two previous occasions. On the morning of October 1, 1994, Kelly ingested an overdose of prescribed medications and was transported to Cottonwood Hospital. On that very night, Kelly's roommates had taken her police weapon because they felt she might take her life with it. After the attempted suicide, Kelly's treating physician prescribed medication, which included depression medications and Ambien. Six weeks later, Kelly again tried to take her life, this time by overdosing on Ambien. She was discovered in her vehicle up Big Cottonwood Canyon and taken in for medical help.

¶ 9 Thereafter, Kelly was given a "fitness for duty" evaluation which concluded she had a substance abuse problem. She also received a disciplinary letter delineating violations of Department policy. Her continued employment status was conditioned on her participation in a monitored substance abuse program and indefinite absolute sobriety, and she was warned that any similar future conduct "will be cause for further disciplinary action up to and including termination." Kelly completed her substance abuse and after-care program, but only after additional pressure was exerted by the Department because of her uncooperative attitude.

¶ 10 During her participation in the aftercare program, Kelly was involved in a single-car accident in her police vehicle at 2:00 a.m. on June 28, 1995. Her vehicle had jumped the curb and run into a tree because she was distracted while adjusting the placement of her radio. There was some suspicion she was impaired, although she said she was not. Kelly submitted to a urine screen, and the test was negative. She was given a letter of reprimand as a result of the collision—her second preventable accident while driving a police vehicle. She was later given a letter of reprimand and required to pay for the damage when the oil in her police cruiser had run dry, and the engine seized due to her neglect.

¶ 11 On July 1, 1998, Kelly failed to report to work. That morning she called her work section and reported she was waiting for an exterminator to come to her house. She remained at home, and later reported she had to visit a veterinarian with her pet because of the infestation. Her supervisor was concerned about inconsistencies in her story and the Department initiated an investigation. A month later she finally admitted she had made up the stories. Termination was recommended by Kelly's division commander then, but the Chief decided to give her one

more chance, telling her in a letter that her peers were aware of her lying and had lost confidence in her; that her immediate supervisors recommended termination; that she would be suspended without pay for five days; and that she was to consider herself on notice regarding any future misconduct, stating, "You are hereby put on notice that ANY future violation of Department policy will not be tolerated and if such violation(s) occur, your employment status will be in jeopardy." This stern warning was given about three months before her misuse of Ambien, which precipitated the events that led to her termination.

### c. Administrative Appeal

¶ 12 After being fired, Kelly appealed to the Salt Lake City Civil Service Commission, seeking reinstatement. The Commission upheld the Chief's decision, finding that Kelly voluntarily ingested a substance inconsistent with medical advice so that she acted intentionally and "was responsible and accountable for her actions even though she was intoxicated." The Commission also found that Kelly's repeated calls were an abuse of the City's emergency dispatch, that her threats were violations of her public safety responsibilities, and that her conduct impacted the credibility of the Department and its ability to perform its mission.

¶ 13 The Commission concluded these findings supported the charge of conduct unbecoming an officer. It also stated that the Department "used a range of disciplinary and counseling measures to bring Officer Kelly's conduct and performance into conformity with Police Department policies prior to releasing her from employment[.]" Kelly seeks our review of the Commission's order.

## ISSUES AND STANDARD OF REVIEW

¶ 14 Kelly argues on appeal that her termination and the Commission's decision to uphold her termination are in error for three reasons. First, she argues that the facts do not support the charges against her because her conduct was not willful; second, she maintains that termination was a dispropor-

tionate penalty; and third, she argues her termination was inconsistent with the treatment of other officers guilty of similar misconduct.

¶ 15 We review the final decision of the Commission only "for the purpose of determining if the commission has abused its discretion or exceeded its authority." Utah Code Ann. § 10–3–1012.5 (1999).[1] Our review is limited to "the record of the commission." *Id.* " 'Discretion may be best viewed as an arena bounded by the law, within which the [Commission] may exercise its judgment as it sees fit.' Unless the Commission 'has stepped out of the arena of discretion and thereby crossed the law,' we will affirm the Commission's order." *Salt Lake City Corp. v. Salt Lake. City Civ. Serv. Comm'n,* 908 P.2d 871, 874 (Utah Ct.App.1995) (citations omitted; alteration in original). Insofar as Kelly tries to have the Commission's factual findings overturned, we employ a clearly erroneous standard. *See Tolman v. Salt Lake County Attorney,* 818 P.2d 23, 27 (Utah Ct. App.1991).

## ANALYSIS

¶ 16 The Commission has the statutory authority to conduct appeals brought by suspended or discharged employees, and in that regard, to make two inquiries: "(1) do the facts support the charges made by the department head, and, if so, (2) do the charges warrant the sanction imposed?" *In re Discharge of Jones,* 720 P.2d 1356, 1361 (Utah 1986). *See also Vetterli v. Civil Serv. Comm'n,* 106 Utah 83, 145 P.2d 792, 797 (1944) (construing predecessor of Utah Code Ann. § 10–3–1012 (1999), which was identical except it only authorized Commission review of employee's outright discharge, not suspension). Thus, the Commission must first determine if discipline was warranted, and, if so, whether the discipline imposed was appropriate. If the Commission answers no to either question, it must reverse the action taken administratively. The Commission answered yes to both questions in this case, and we now review its order.

---

1. Strangely, section 10–3–1012.5, providing that appeals from municipal civil service commis-

sions come to the court of appeals, is titled "Appeal to district court."

I. Factual Basis for Charges

¶ 17 Had Kelly not been intoxicated when she made the non-emergency phone calls on November 9, 1998, there is no doubt her actions would be conduct unbecoming an officer,[2] which is defined as:

A. Behavior or activity that is contrary to police ethics.

B. Conduct that is not in the best interest of the Department's public image.

C. Conduct that is subversive to the morale, efficiency and operation of the Department.

D. Conduct that has a tendency to adversely affect, lower, or harm the public interest and confidence of the Employee or the reputation of the Department.

The foregoing are not exclusive but are merely illustrative and intended to be a guideline for unacceptable activity or behavior.

Salt Lake Police Dep't, Police Manual § 3–01–07.01 (rev. July 1998). Kelly argues that the charge of conduct unbecoming an officer "requires at least a demonstration that the officer's conduct was voluntary 'so that [s]he [can] be shown to be responsible for the actions themselves, without regard to any intentions which [s]he may or may not have had concerning their effect.'" *Perry v. Philadelphia Civ. Serv. Comm'n,* 108 Pa.Cmwlth. 322, 529 A.2d 616, 617 (1987) (citation omitted). Basically, Kelly claims her conduct should be excused because her intoxication was involuntary, as the effect of the drug was not what she anticipated. *See State v. Gardner,* 870 P.2d 900, 901–02 (Utah 1993) (setting out standard for involuntary intoxication).

¶ 18 The Commission's findings—that the act of ingesting the medication in a manner inconsistent with medical advice was voluntary, thereby making her responsible for her conduct while intoxicated—are at odds with Kelly's assertion. We cannot say these findings are clearly erroneous. Kelly had been prescribed Ambien in the past. In fact, it was the very drug she had previously used to attempt suicide. Kelly's disregard for the instructions to take the medication and go to bed [3]—instead staying in the living room, watching television, and playing video games—readily supports a finding of voluntary misuse. Moreover, her roommate's statement later that morning, that Kelly said she was going to take enough Ambien to "feel good," supports a finding that her use of Ambien on this particular occasion was recreational, and thus voluntary.

¶ 19 Having concluded that the Commission's finding about the voluntary misuse of Ambien was not clearly erroneous, Kelly is properly held responsible for her conduct while intoxicated. *Cf.* Utah Code Ann. § 76–2–306 (1999) ("[I]f reckless or criminal negligence establishes an element of an offense and the actor is unaware of the risk because of voluntary intoxication, his unawareness is immaterial in a prosecution for that offense."); *id.* § 76–2–305(3) ("A person who asserts a defense of . . . diminished mental capacity, and who is under the influence of voluntarily consumed . . . controlled substances, or volatile substances at the time of the alleged offense is not excused from criminal responsibility . . . if the . . . substance caused, triggered, or substantially contributed to the mental illness."). Therefore, her actions warranted discipline.

¶ 20 Moreover, accepting, arguendo, Kelly's contention that her bizarre behavior did

---

2. We reject Kelly's argument that her conduct was not subversive to the operation of the Department simply because her threats were not taken seriously. Common sense, as well as signs at airport and other security check points, confirm that bombs and fires are not matters about which one is free to joke with law enforcement personnel. Likewise, it was for the Commission to decide if the nature of her calls abused emergency dispatch services. The Commission's conclusions are not outside the bounds of sound discretion.

3. Even if, contrary to his usual practice, Dr. Lowry failed to impart these instructions to Kelly, the very point of a sleep aid is to help one fall asleep. Kelly obviously had recreational, rather than somnolent, objectives in mind when she popped double the prescribed dose and, far from turning in for the night, stayed up to play video games and bother people over the telephone.

not reach the level of conduct unbecoming an officer, even she admits her conduct involved a violation of departmental policy warranting some sanction.[4] We conclude there was a sufficient factual basis for the Chief to levy some sanction and move to the more problematic issue—whether Kelly's conduct warranted the sanction imposed.

## II. Sanction Warranted

 ¶ 21 Under the specific circumstances of this case, the second question—"do the charges warrant the sanction imposed," *In re Discharge of Jones*, 720 P.2d 1356, 1361 (Utah 1986)—breaks down into two sub-questions: First, is the sanction proportional; and second, is the sanction consistent with previous sanctions imposed by the department pursuant to its own policies. *See Lucas v. Murray City Civ. Serv. Comm'n*, 949 P.2d 746, 761 (Utah Ct.App.1997). We will address these two questions in turn.

### a. Proportionality of Sanction Imposed

 ¶ 22 While conceding her conduct warranted some sanction, Kelly challenges her termination as disproportionate, stating that no officer has ever previously been terminated for similar misuse of a prescription drug. "In determining whether the charges warrant the disciplinary action taken, we acknowledge that discipline imposed for employee misconduct is within the sound discretion of the Chief." *Id.* The Chief must have the ability to manage and direct his officers, and is in the best position to know whether their actions merit discipline. *See In re Dis-*

*charge of Jones*, 720 P.2d 1356, 1363 (Utah 1986). We therefore proceed cautiously, so as not to undermine the Chief's authority, noting however, that he exceeds the scope of his discretion if the punishment imposed is in excess of "the range of sanctions permitted by statute or regulation, or if, in light of all the circumstances, the punishment is disproportionate to the offense." *Lucas*, 949 P.2d at 761.

 ¶ 23 It should be noted that the Commission's review of the Chief's decision was an all-or-nothing proposition, as is our review of the Commission's order. Thus, even if we agree there was misconduct but cannot abide the sanction of termination, we are not in a position to remand this case to the Commission to adjust the sanction imposed, as the Commission's role is simply to affirm or reverse the police chief's decision, and it lacks the power to modify or remand. *See Salt Lake City Corp. v. Salt Lake City Civ. Serv. Comm'n*, 908 P.2d 871, 875 (Utah Ct.App.1995) (holding Commission's authority only permits affirming or reversing sanctions imposed by police chief, not remanding or modifying imposed sanction).[5]

 ¶ 24 We agree with Kelly that such an onerous sanction has never been imposed for similar improper use of a prescription drug, and if this were the sole basis for her termination we might well see an abuse of discretion. However, neither the Chief nor the Commission were simply sanctioning this single incident, which both sides agree was not enough, by itself, to warrant Kelly's ter-

---

4. During the three-day hearing on this matter, the Commission Chair and Kelly had the following exchange, with our emphasis:

 Chairman: Commissioner Corrigan asked you if you thought that the [disciplinary] action taken [against you previously] was appropriate action [when you admitted to] lying under *Garrity*, and you indicated yes, you felt it was appropriate. And then in this case, you indicated that, no, you didn't think termination was appropriate *but you did think there should be some action taken because of your behavior.* Kelly: Exactly.

5. Counsel for the City urged us at oral argument to modify this rule, and allow proceedings to be remanded or modified so that in cases where the Chief's sanctions are inconsistent or too harsh,

those sanctions could be modified rather than letting offending officers go undisciplined for their conduct. However, "[w]e are not at liberty to overrule our prior holding." *Kunz & Co. v. State Dep't of Transp.*, 949 P.2d 763, 767 (Utah Ct.App.1997). Moreover, the Utah Legislature is in the best position to modify the language of the statute that we reasoned "does not authorize the Commission to modify suspension or termination decisions or to remand such decisions for further proceedings." *Salt Lake City Corp. v. Salt Lake City Civ. Serv. Comm'n*, 908 P.2d 871, 875–76 (Utah Ct.App.1995) (discussing Utah Code Ann. § 10–3–1012 (1999), which says Commission "shall fully hear and determine" appeals of suspension or termination and that Commission's order "shall be final and immediately enforced").

mination. We must review the sanction in light of all the circumstances underlying the termination, and from that more expansive view, we simply cannot say the punishment is disproportionate to the conduct.

¶ 25 The Chief had progressively disciplined Kelly. Kelly's termination was the culmination of several instances of misconduct, as detailed above, which concluded with this final act of voluntary misuse of her prescription drug and her ensuing disruption of the dispatch staff. The circumstances reveal this final act was merely the straw that broke the camel's back. The import of that final straw was not unknown to Kelly. The Chief had warned Kelly just three months earlier:

> You are hereby put on notice that ANY future violations of Department policy will not be tolerated and if such violation(s) occur, your employment status will be in jeopardy.

And just a few months before that, she had been warned that any substance abuse would jeopardize her continued employment by the Department. Thus, the Chief's decision, and the Commission's decision on review, were fully justified given Kelly's overall conduct. Both concluded termination, on balance, was in order.[6] We agree.

¶ 26 The record shows that Kelly was not only guilty of a present violation, but that she had also violated several policies on previous occasions—some of which were arguably related to the instant misconduct, although such a link between instances of misconduct is not necessarily required—and had been warned about the gravity of any future misconduct. It thus seems obvious that Kelly, although having many commendable qualities as an officer, was not able to discipline herself or to conform to the various policies of the Department. If anything, the record shows that Kelly was the beneficiary of remarkable disciplinary restraint by the Department in the past.

b. Consistency of Sanction Imposed

¶ 27 Beyond the question of proportionality, Officer Kelly argues that the Commission abused its discretion by failing to make specific findings regarding whether the Chief's action was consistent with the treatment of other officers for similar or more egregious conduct. Kelly relies on *Pickett v. Utah Department of Commerce*, 858 P.2d 187, 191 (Utah Ct.App.1993). Kelly argues the Chief must act consistently with his prior course of imposing more lenient penalties for conduct allegedly like that engaged in by Kelly. The City agrees that the Commission must consider the consistency of Kelly's treatment, but only after a prima facie showing by Kelly that the Chief's actions in her case were contrary to his prior practice. *See id.* The City finds support for its position not only in *Pickett*, but also in *Taylor v. Utah Department of Commerce*, 952 P.2d 1090, 1094–95 (Utah Ct.App.1998). *See also SEMECO Indus. v. State Tax Comm'n*, 849 P.2d 1167, 1174 (Utah 1993) (Durham, J., dissenting).

¶ 28 This consistency element simply requires the Department to abide by its own policies, as outlined in *Lucas v. Murray City Civ. Service Commission*, 949 P.2d 746, 761 (Utah Ct.App.1997), and as recognized in the Department's own regulations:

> Positive corrective action should be considered before the imposition of sanctions. The following factors should be considered when determining the degree of disciplinary action needed:
>
> . . .
>
> 5. Consistency of discipline.

Salt Lake Police Dep't, Police Manual § 3–111–02.00 (rev. Nov.1997). Given this policy, an inconsistency in Kelly's sanction when compared to other sanctions levied for similar conduct would be a factor in determining if the Chief acted outside his permitted discretion.

---

**6.** Kelly argues the Commission did not make a specific finding about proportionality. We disagree. While the language was not precisely couched in terms of proportionality, the Commission's finding that the Department and Chief "used a range of disciplinary and counseling measures to bring Officer Kelly's conduct and performance into conformity with Police Department policies prior to releasing her from employment," amounts to a determination that, on balance, her full record, including all the second chance and reform opportunities accorded her, supports her sanction, which is thus proportional.

¶ 29 We note that *Pickett, Taylor,* and *SEMECO,* invoked as authoritative by the parties, are all governed by, and involve the interpretation of, the Utah Administrative Procedures Act (UAPA), particularly Utah Code Ann. § 63–46b–16(4)(h)(iii) (1997) [7], and that this case is not governed by the UAPA. However, both parties argue that the reasoning and logic of those cases is instructive due to the similar consistency requirement in the Department's own policies. We agree, and at the parties' suggestion, will use the basic approach employed in the aforementioned UAPA cases, in particular, the burden of proof analysis.

¶ 30 Under this framework, the burden was on Kelly to establish a prima facie case that the Chief acted inconsistently in imposing sanctions by presenting sufficient evidence from which the Commission could reasonably find a relevant inconsistency. *Cf. SEMECO,* 849 P.2d at 1174 (Durham, J., dissenting) [8] ("[I]n the typical challenge to agency action, the party challenging the action carries the burden of demonstrating its impropriety."). This burden of proof is not unlike claims of disparate discipline of public employees on the basis of race, where the disciplined employee must first make out a prima facie case by pointing to specific instances or statistics, rather than relying on an unsupported assertion of inconsistent punishments. *See Stotts v. Memphis Fire Dep't,* 858 F.2d 289, 294 (6th Cir.1988) (reversing court's order and dismissing employee because finding of disparate discipline on basis of race was clearly erroneous); *Moore v. City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir.), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). While there is no requirement in this context that Kelly show the disparity is motivated by race or even animosity, she must, at a minimum, carry the burden of showing some meaningful disparity of treatment between herself and other similarly situated employees.

¶ 31 In support of her contention that the Chief acted inconsistently, Kelly points to numerous cases where sanctions were imposed on her fellow officers who had engaged in inappropriate conduct. However, none of these prior sanctions present us with evidence sufficient to make a prima facie showing of inconsistency. Meaningful disparate treatment can only be found when similar factual circumstances led to a different result without explanation. *See Taylor,* 952 P.2d at 1094–95; *Stotts,* 858 F.2d at 294. Each instance presented by Kelly, in her attempt to show similar circumstances resulting in lesser discipline of her fellow officers, either involves a single episode of misconduct or multiple episodes that do not realistically compare to Kelly's overall conduct.

¶ 32 For example, Kelly makes much of the fact that one fellow officer attempted suicide by overdosing on prescription medication and received a letter of reprimand. However, Kelly likewise received a letter of reprimand after her *second* suicide attempt. We see nothing inconsistent here, and, in fact, recognize additional leniency afforded Kelly, who was not similarly reprimanded for her first attempt. That same fellow officer later filed a false police report and was given a second letter of reprimand. Kelly was also disciplined for dishonesty relating to her failure to come to work, a recurring problem in her history with the Department. She was not truthful with her superior about why she was not at work, and she lied again after being given a *Garrity* warning by her supervisors.[9] Admittedly, she was suspended for

---

7. Utah Code Ann. § 63–46b–16 (1997) states in relevant part:
 (4) The appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by any of the following:
 (h) the agency action is:
 (iii) contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency[.]

8. "The majority opinion in *SEMECO* had no occasion to discuss the issue addressed by this portion of Justice Durham's dissenting opinion ... or remark on her discussion of burdens of proof." *Pickett v. Utah Dep't of Commerce,* 858 P.2d 187, 191 n. 9 (Utah Ct.App.1993). Consequently, we have adopted her insightful burdens-of-proof analysis in the context of UAPA. *See id.*

9. A *Garrity* warning allows a police officer's superiors to order an officer to provide information during an investigation, and requires the officer to comply, but provides that any information

a short time, a punishment more severe than that imposed on her fellow officer, but Kelly admits her suspension was justified. *See supra*, note 4 ("Chairman: Commissioner Corrigan asked you if you thought that the action taken was appropriate action [when you lied] under *Garrity*, and you indicated yes, you felt it was appropriate.... Kelly: Exactly.").

¶ 33 The fatal flaw in Kelly's claim of inconsistency is that none of her fellow officers have taken their sanctionable violations that *one additional step* after being given a letter warning of termination for any additional violation. Kelly offered no evidence that any fellow officer, receiving such a warning following a suicide attempt and after admitting to making a false statement, then improperly took a prescription drug, or called in a bomb threat while intoxicated. Fortunately for the citizens of Salt Lake, the Chief has not frequently had to deal with an officer who attempted suicide twice; was routinely late or absent and then lied about an absence on multiple occasions; was given multiple warnings; and ultimately misused the same prescription drug previously used to attempt suicide and then made bomb threats, engaged in sexual innuendo, and bothered police dispatchers. But this does not mean he cannot terminate someone for such conduct. *See Vukovich v. Civil Serv. Comm'n*, 832 P.2d 1126, 1128 (Colo.Ct.App. 1992). The Department does "not carry the burden of persuasion as to the nonexistence of a disparity," rather, the burden to show the existence of disparity remains with Kelly. *Segar v. Smith*, 738 F.2d 1249, 1268 (D.C.Cir. 1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). From all that appears, no other officer brought to our attention had received a one-more-violation-and-you-are-through letter, then violated pol-

icy like Kelly, and was simply reprimanded or suspended as a result. Kelly's multitude of violations is unlike any other brought to our attention. *See Taylor*, 952 P.2d at 1095 ("Taylor's case is not comparable ... [and thus] Taylor has not established a prima facie case"). Her conduct was uniquely opprobrious and her termination was manifestly in order.[10]

### CONCLUSION

¶ 34 The Commission's record contained a sufficient factual basis for the Chief to levy sanctions against Kelly when it concluded her misuse of Ambien was voluntary. The Commission did not abuse its discretion in concluding that the Chief's decision to terminate Kelly was proportionate to the offense when viewed in light of her entire record with the Department, specifically recognizing that the Chief had given her many opportunities to correct her behavior and had engaged in progressive discipline. The Commission did not abuse its discretion in failing to make specific findings regarding the consistency of the sanction with prior sanctions levied by the Chief because Kelly had failed to point to sufficiently similar episodes of conduct by other officers so as to trigger consistency analysis.

¶ 35 Affirmed.

¶ 36 WE CONCUR: JUDITH M. BILLINGS, Judge, and JAMES Z. DAVIS, Judge.

---

elicited by such order cannot be used against the officer in a subsequent criminal prosecution. *See Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

10. It should not be feared that a party who is severely punished, but has no history of inconsis-

tency to turn to, is without recourse. While the party may have no basis to claim disparity, the party still retains the protection of proportionality review. *See In re Discharge of Jones*, 720 P.2d 1356, 1361 (Utah 1986).