2014 UT App 158

**Sean BROWN, Petitioner,**

v.

**SANDY CITY APPEAL BOARD, Respondent.**

**No. 20130433–CA.**

Court of Appeals of Utah.

July 3, 2014.

Bret W. Rawson and Nate N. Nelson, for Petitioner.

Stanley J. Preston, Bryan M. Scott, and Brandon T. Crowther, for Respondent.

Judge JOHN A. PEARCE authored this Opinion, in which Judges GREGORY K. ORME and MICHELE M. CHRISTIANSEN concurred.

## Opinion

PEARCE, Judge:

¶ 1 Sean Brown petitions for judicial review of the Sandy City Appeal Board's (the Board) decision to uphold his termination from the Sandy City Police Department. We decline to disturb the Board's decision.

## BACKGROUND

¶ 2 The Sandy City Police Department employed Brown as a detective. Although Brown's formal reviews over his seventeen-year career with the department had been exemplary, he also had a history of difficulty getting along with other detectives. On April 24, 2012, the police chief placed Brown on paid administrative leave based upon the chief's perception that Brown was not psychologically fit for duty. This perception arose from Brown's anger toward certain other detectives and his overall volatile and antisocial demeanor. The police chief required Brown to submit to a fitness for duty evaluation as a condition of reinstatement.

¶ 3 As part of that evaluation, Brown underwent an examination by psychologist Dr. Mark Zelig.[1] On July 16, 2012, Zelig issued a report concluding that Brown suffered from a personality disorder with prominent paranoid features and that, as a result, he was psychologically unfit for duty under Utah's Peace Officer Standards and Training (POST) requirements. Zelig reached this conclusion, in part, by looking to California's POST standards for guidance regarding police officer personality disorders. Zelig expressed concern that Brown's pattern of defensiveness and distancing himself from others in the workplace had become markedly more pronounced in the prior twelve months.

¶ 4 After Zelig issued his report, Brown sought and was granted twelve weeks of medical leave to obtain treatment and establish that he was fit for duty. During this time, he attended approximately twelve counseling sessions with a licensed clinical social worker. Upon the expiration of the twelve weeks of medical leave, Brown was allowed to use his accrued sick and vacation leave to obtain further time for treatment and reevaluation.[2] Brown depleted his accrued leave on February 4, 2013. The police chief terminated Brown that same day because the chief believed Brown had not provided evidence of rehabilitation sufficient to allow the chief to conclude that Brown had regained his fitness for duty.[3]

---

1. Dr. Heather Walker, another psychologist, also participated in Brown's evaluation and the issuance of the resulting report.

2. The record suggests that the police chief's decision to allow Brown to use his accrued leave to extend his rehabilitation period was a measure of leniency and an accommodation not provided to other employees.

3. Just prior to Brown's termination, the social worker provided a letter to the police chief opining that Brown was not a danger to himself or others and that he did not appear to have any

¶ 5 During his leave period, Brown expressed a desire to undergo a reevaluation. On July 30, 2012, Brown requested that Zelig and the police chief release Zelig's report and the data underlying it to another psychologist, Dr. Lawrence Blum, for purposes of reevaluating Brown's fitness for duty. Sandy City released those materials to Blum almost four months after the request, on November 26, 2012.[4] Brown eventually met with Blum for a two-and-a-half-hour interview on February 7, 2013, three days after Brown's termination. Blum concluded that Brown was fit for duty.

¶ 6 Brown appealed his termination to the Board, which held a two-day hearing. Brown, Zelig, Blum, and other witnesses testified. After the hearing, the Board issued a written decision denying Brown's appeal and upholding his termination. The Board's order summarized its findings:

> Specifically, the Board finds that, given Mr. Brown's conduct, [the police chief] was justified in requesting that Mr. Brown submit to a fitness for duty evaluation. The Board further finds that, after Mr. Brown was declared unfit for duty, he failed to submit any credible evidence that he was fit for duty, and therefore able to return to work, prior to the time that Mr. Brown had exhausted his [medical] leave, and his accrued sick leave and vacation leave. Therefore, the Board determines that [the police chief] had no other option but to terminate Mr. Brown on February 4, 2013, in accordance with the City's Leave Without Pay Policy, based on the facts known to [the police chief] at the time of Mr. Brown's termination.

The Board expressly accepted Zelig's conclusions that Brown suffered from a personality disorder and was not fit for duty.

¶ 7 The Board acknowledged both the social worker's letter detailing her counseling of Brown and Blum's post-termination assessment of Brown's fitness, but it also explained why it did not find either assessment to be credible evidence that Brown had regained his fitness for duty. The Board also found that Brown's termination "was consistent with the manner in which [the police chief] has handled similarly situated employees related to fitness for duty." In response to Brown's argument that he had not been afforded an opportunity to adequately address Zelig's report, the Board "determine[d] that Mr. Brown was given ample time to either submit a contrary report to that of Drs. Zelig and Walker declaring Mr. Brown fit for duty, or to receive treatment and have Dr. Zelig perform a re-evaluation." Brown now seeks judicial review of the Board's decision.

## ISSUES AND STANDARDS OF REVIEW

¶ 8 Brown's arguments fall into two general categories. First, he raises multiple challenges to the Board's conclusion that he was unfit for duty, and particularly its reliance upon Zelig's report, testimony, and conclusions. Second, Brown argues that the Board should not have upheld his termination in light of the Sandy City Police Department's prior practices involving fitness for duty evaluations and its failure to facilitate his request for a timely reevaluation. Our review of the Board's decision is "statutorily limited to an abuse of discretion standard of review." *Nelson v. City of Orem*, 2013 UT 53, ¶ 26, 309 P.3d 237; *see also* Utah Code Ann. § 10–3–1106(6)(c) (LexisNexis 2012).[5]

---

significant mental health issues that would interfere with his police duties. However, in his termination letter to Brown, the chief explained that the social worker's "training and experience do not match that of Dr. Zelig" and that her statement "was not sufficiently specific to provide helpful guidance to me."

4. Shortly before the records were released to Blum, Brown left a voicemail message for the police chief stating that Brown would also like Zelig to reevaluate him. However, that reevaluation never took place.

5. Brown urges us to evaluate the Board's decision under the test that this court has previously applied in employee discipline cases. *See Harmon v. Ogden City Civil Serv. Comm'n*, 2007 UT App 336, ¶ 6, 171 P.3d 474 (stating that an employee seeking relief from a disciplinary termination "must show either (1) that the facts do not support the action taken by [employer] or (2) that the charges do not warrant the sanction imposed"); *Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 21, 8 P.3d 1048 ("[T]he second question—'do the charges warrant the sanction imposed'—breaks down into

## ANALYSIS

### I. Brown's Fitness for Duty

¶ 9 Brown raises multiple arguments challenging the Board's acceptance of Zelig's conclusion that Brown suffered from a personality disorder that rendered him unfit for duty. Brown also argues that the Board abused its discretion by rendering its own "expert" opinion that Brown's recording of conversations with others in his chain of command was consistent with the paranoid tendencies diagnosed by Zelig. We address these arguments in the order raised in Brown's appellate brief.

¶ 10 Brown first argues that the Board erred in relying on Zelig's logic in concluding that Brown could not meet Utah POST standards. Zelig testified that Brown failed to meet the POST standards because Brown had a mental condition—a personality disorder—that adversely affected the performance of his duties as a police officer. However, according to Brown, a personality disorder is defined as "a functional impairment that adversely affects one's ability to do his job." Brown argues that Zelig's logic is flawed because under that definition of a personality disorder, "Brown cannot have [the] referenced mental condition without the existence of a functional impairment and thereby a personality disorder." Brown, in essence, argues that Zelig engaged in circular reasoning to reach the conclusion that the Board adopted.

¶ 11 We see no logical problem with Zelig's diagnosis. Zelig's conclusions that Brown had a personality disorder and that he was unfit for duty are not inconsistent or other-

wise logically flawed merely because both conclusions incorporate the concept of functional impairment. To the contrary, Zelig's use of functional impairment in his definitions ensures that an officer's duty rating reflects Zelig's opinion about whether the officer can functionally perform the duties of a police officer.[6]

¶ 12 Second, Brown argues that the Board abused its discretion when it relied on Zelig's use of California POST standards in his evaluation of Brown's fitness for duty. Brown argues that he is not required to meet California POST standards and that the Board's reliance on Zelig's conclusions in light of his use of the California standards was arbitrary, capricious, and unreasonable.

¶ 13 We readily agree with Brown that Utah law enforcement officers are not required to comply with the POST standards promulgated by other jurisdictions. However, Brown significantly overstates how Zelig used the California standards. As Zelig explained in his report, his opinion of Brown's fitness for duty "was informed by consulting published standards of psychological competence applicable to peace officers," and the California standards included certain "dimensions" that applied to Brown's diagnosis.[7]

¶ 14 We view Zelig's consideration of the California POST standards as analogous to the way that a court might use case law from sister jurisdictions—not as binding authority but as a reference to consider how other courts have analyzed and resolved a particular issue. Here, California and Utah apparently share a common requirement that peace officers be mentally fit for duty. How-

---

two sub-questions: First, is the sanction proportional; and second, is the sanction consistent with previous sanctions imposed by the department pursuant to its own policies." (citation omitted)). Although these inquiries remain a "useful framework" in disciplinary cases, the Utah Supreme Court has instructed that they "should not be viewed as a stand-alone test for reviewing the validity of the Board's decision relating to employee discipline." *Nelson v. City of Orem*, 2013 UT 53, ¶ 29, 309 P.3d 237. Further, these inquiries were developed in the context of employee discipline cases. This case is not a disciplinary matter but instead involves an evaluation of Brown's fitness for duty. For these reasons, we review the Board's decision under

the general abuse of discretion standard *Nelson* outlines and do not attempt to shoehorn our analysis into the framework *Harmon* and *Kelly* employed.

6. Presumably, if Brown's personality did not functionally impair his ability to perform his duties, Zelig would not have made either a diagnosis of a personality disorder *or* a determination that Brown was unfit for duty.

7. These "dimensions" consisted of definitions and examples of the three concepts of "social competence," "teamwork," and "emotional regulation/stress tolerance."

ever, unlike Utah, California has provided additional guidance for evaluating officers' mental competence.

¶ 15 We see nothing wrong with Zelig's use of California's more informative standards to flesh out Utah's general requirement of mental competence as it applied to Brown. Further, Zelig ultimately concluded that Brown's functional impairments "are significant and impair his ability to meet the California POST standards, an applicable Sandy City position description, *and* to satisfy the requirements set forth by Utah's POST as it pertains to peace officer certification." (Emphasis added.) Thus, Zelig did determine that Brown was unfit for duty under the Utah standards that directly applied to him.[8]

■ ¶ 16 Third, Brown argues that Zelig's methodology was flawed because Zelig failed to review Brown's seventeen-year performance history, failed to follow up with officers who had a good working relationship with Brown, and failed to substantiate the facts that Brown cited to explain his feelings of resentment toward a specific coworker. Zelig's report demonstrates that he was well aware of Brown's long and successful career, the fact that there were officers with whom Brown maintained a good working relationship, and Brown's version of the events underlying his disputes with various coworkers. Thus, Brown significantly overstates Zelig's alleged failures.

¶ 17 Even if Zelig could have placed greater weight on the factors Brown identifies, " 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.' " *Gunn Hill Dairy Props., LLC v. Los Angeles Dep't of Water & Power*, 2012 UT App 20, ¶ 43, 269 P.3d 980 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir.2002)). Brown had ample opportunity at his hearing to cast doubts on Zelig's conclusions by cross-examining him on the alleged flaws in his methodology. *Cf. id.* ("Vigorous cross-examination of a study's inadequacies

allows the jury to appropriately weigh the alleged defects[.]" (alteration in original) (citation and internal quotation marks omitted)). Despite the flaws that Brown alleges, the Board expressly noted that it was "impressed by [Zelig's] methodology." In light of these considerations, we will not disturb the Board's decision because of the alleged flaws in Zelig's analysis.

■ ¶ 18 Fourth, Brown argues that Zelig's report could not support a finding of his unfitness because the report stated that Brown could be amiable with his coworkers immediately upon returning to work if his employment was conditioned on it. Brown's argument is unpersuasive in light of Zelig's entire analysis of this issue:

> Detective Brown appears to be a dedicated officer, whom we suspect would exert his best effort in treatment if told that continued employment was contingent on such participation. In such a scenario we suspect that Detective Brown would immediately bridle his underlying suspiciousness and hostility, and would be able to present a convincing facade of amiability, but without resolution of the underlying defect which drove this problem to the forefront. Learning to replace his vigilance and mistrust of others with a reasonable level of *underlying* trust in his coworkers which would allow him to be a fully functioning team member is likely to be a slow-going process. In the meantime, any surface amicability might collapse in a high stress situation. Thus, we are concerned that even with a concerted effort, that change will be slow and tedious.

Zelig's full statement reveals a concern that any facade of amicability that Brown might be able to display would be just that, a facade that could crumble in the face of the high stress situations that are common to police work. We see no inconsistency between this concern and Zelig's ultimate conclusion that Brown was mentally unfit for duty.

---

8. Zelig's consultation of the California standards may have proved problematic if he had imported any additional requirements into the Utah standards. However, Brown has not pointed to any specific example of how Zelig's consideration of the California standards bled into the Board's analysis of the Utah standards or added any additional element to the Utah standards.

¶ 19 Finally, Brown argues that the Board abused its discretion when it noted that Brown's conduct of surreptitiously recording conversations with supervisors, which he admitted to at the hearing, "is consistent with [Zelig's] opinion regarding Mr. Brown's paranoia." We agree with Brown that the Board, which apparently lacked any psychological expertise, should not have expanded upon Zelig's conclusions in this fashion. *See Langlitz v. Board of Registration of Chiropractors*, 396 Mass. 374, 486 N.E.2d 48, 53 (1985) ("[A]n agency or board may not sit as a silent witness where expert testimony is required to establish an evidentiary basis for its conclusions. . . .").

¶ 20 Brown's psychological condition was the primary disputed issue in this matter and was the subject of testimony by multiple experts. The Board should have limited its statements about Brown's mental condition to the opinion evidence presented through those experts. However, the Board's finding in this regard is akin to dicta, and given the Board's acceptance of Zelig's professional opinion, we see no reasonable possibility of a more favorable result for Brown had the Board refrained from playing armchair psychologist on this issue. We therefore do not disturb the Board's decision on this basis, even though the Board's comment about paranoia was not appropriate.

## II. Brown's Efforts to Obtain a Reevaluation

¶ 21 Brown also raises two arguments pertaining to his efforts to reestablish his fitness for duty through rehabilitation and reevaluation. First, he argues that the Board erred by ignoring his pre-termination request to be reevaluated and the police chief's failure to respond to that request. Second, he argues that the Board erred by determining that he was given ample time to provide a second opinion concerning his fitness for duty.

¶ 22 Brown's first argument is premised on an October 2012 voicemail message from Brown to the police chief, wherein he requested a reevaluation of his fitness for duty. Brown argues that the Board erred by ignoring the fact that he had sought, and been denied, a reevaluation. The record re-veals that Brown's voicemail apparently prompted some communication between the police chief and Zelig, but Zelig never reevaluated Brown's fitness for duty.

¶ 23 The Board's decision did not directly discuss the voicemail, but it did generally address Brown's efforts to be reevaluated. The decision noted that Brown's counsel was "well aware of the process necessary to request a re-evaluation" because counsel had obtained a reevaluation of another officer by submitting a written request accompanied by a release of the officer's rehabilitative treatment records. The Board then stated, "No such formal request for a reevaluation of Mr. Brown by Dr. Zelig was ever sent to Dr. Zelig from Mr. Brown's attorneys in this matter, nor was a signed release sent to the City regarding any on-going psychological counseling of Mr. Brown."

¶ 24 In light of the Board's observations, we cannot agree with Brown's characterization that the Board "categorically ignored" his request. To the contrary, it appears that the Board's statements were aimed at distinguishing Brown's single informal voicemail request from the more formal request that had previously resulted in the reevaluation of another officer. More importantly, Brown fails to explain satisfactorily why his single voicemail excused him from any further attempts to obtain a reevaluation in the months between the October 2012 voicemail message and his February 2013 termination. Brown also fails to establish that any reevaluation by Zelig would have resulted in the conclusion that Brown had regained his fitness for duty, and he thus fails to demonstrate any prejudice resulting from the unavailability of a reevaluation. For these reasons, we are unpersuaded that the Board abused its discretion relating to its treatment of Brown's request for reevaluation.

¶ 25 Brown next argues that the Board erred when it concluded that he was given ample time to obtain a second opinion regarding his fitness for duty. The primary focus of Brown's argument is that Sandy City took four months—from July 30, 2012, until November 26, 2012—to release Zelig's report and the underlying data to Blum so that he could provide a second opinion on

Brown's fitness for duty. Again, Brown provides no explanation for his own failure to follow up promptly on the release request when the records were not forthcoming. Further, Brown fails to explain why Blum's review of Zelig's report and data could not have occurred in the ten-week period between the actual release of the materials to Blum and Brown's termination in February 2013. Although both sides could have acted with more diligence, we cannot conclude that the Board's determination that Brown had sufficient time to secure a second opinion on his duty fitness constitutes an abuse of discretion.

## CONCLUSION

¶ 26 We conclude that Brown has failed to establish any flaw in Zelig's methodology or conclusion that would render the Board's reliance on Zelig's report an abuse of discretion. We also conclude that Brown has failed to demonstrate any abuse of discretion by the Board resulting from its treatment of his efforts to obtain either reevaluation by Zelig or a second opinion from Blum or another qualified person. For these reasons, we decline to disturb the Board's decision upholding Brown's termination from the Sandy City Police Department.