v.

**Sean DOYLE, Respondent and Appellant.**

**No. 20120897–CA.**

Court of Appeals of Utah.

July 3, 2014.

Michael J. Langford, for Appellant.

Leslie W. Slaugh, for Appellee.

Judge STEPHEN L. ROTH authored this Memorandum Decision, in which Judge MICHELE M. CHRISTIANSEN concurred. Judge JAMES Z. DAVIS concurred in part and dissented in part, with opinion.

Memorandum Decision

ROTH, Judge:

¶ 1 Sean Doyle appeals the trial court's grant of M.K.'s petition for a civil stalking injunction against him. We affirm.

¶ 2 In order to obtain a civil stalking injunction, M.K. was required to prove, by a preponderance of the evidence, that Doyle intentionally or knowingly engaged in a course of conduct directed at her that he knew or should have known would cause a reasonable person to fear for her safety or to suffer emotional distress. *See* Utah Code Ann. § 77–3a–101(1), (5)(a) (LexisNexis 2012); *id.* § 76–5–106.5(2). Doyle argues that he could not have known that M.K. would fear for her safety or suffer emotional distress as a result of his behavior because Doyle and M.K. were in an ongoing consensual relationship. Whether this type of relationship precludes application of the stalking statute is a question of law, which we review for correctness. *See Bott v. Osburn,* 2011 UT App 139, ¶ 5, 257 P.3d 1022 ("The proper interpretation and application of a statute is a question of law which we review for cor-

rectness, affording no deference to the district court's legal conclusions.").

¶ 3 In *Towner v. Ridgway,* our supreme court rejected the idea that an attempt to obtain a civil stalking injunction may be thwarted where the victim and alleged stalker maintained " 'normal relations' " between stalking incidents. 2008 UT 23, ¶ 14, 182 P.3d 347, *superseded on other grounds by statute as stated in Bott,* 2011 UT App 139, 257 P.3d 1022. The court explained that the parties need not "maintain an adversarial relationship between incidents" and that "intervening conciliatory gestures will not preclude a court from finding a course of conduct." *Id.* Doyle asserts that this case is distinguishable from *Towner* because there was "*significant* consensual contact between the parties after the alleged offending conduct."

¶ 4 However, we are not convinced that even significant consensual contact necessarily negates the intent element of the stalking statute, as Doyle suggests, and the facts of this case illustrate the absurdity of such a conclusion. M.K. testified that, among other things, Doyle repeatedly forced her to engage in sexual activity despite her physical and verbal attempts to prevent him from doing so. Thus, to reach the conclusion Doyle advocates, we would have to conclude that he could not reasonably have known that sexually abusing M.K. would lead her to fear for her safety or suffer emotional distress simply because they were in a relationship at the time the abuse occurred. While the existence of an ongoing relationship could undermine evidence supporting the imposition of a stalking injunction,[1] it does not as a matter of law preclude such an injunction. *Ellison v. Stam,* 2006 UT App 150, ¶ 27, 136 P.3d 1242 (explaining that in evaluating whether a reasonable person would suffer fear or distress as a result of the respondent's actions, the court must consider his conduct "in the context of all the facts and circumstances existing in the case").

¶ 5 Doyle next argues that the trial court erred in taking judicial notice of an

---

1. The significance of the ongoing relationship is a question of fact. Because Doyle has explicitly

declined to challenge the trial court's factual findings, we need not consider this issue further.

"Axis I disorder that battered women tend to have." The trial judge's reference to "Axis I disorder" came during his explanation of why he found credible M.K.'s testimony that she suffered emotional distress as a result of Doyle's abuse despite the fact that she continued contact with him after the abuse:

First, it is undisputed that on November 13th, 2011, there was an act of forcible sexual assault on [M.K.] by [Doyle], that she attempted to fight back ..., [and] that he sat on her with his full weight, causing her not to be able to breathe.... [A] reasonable person would suffer ... physical harm and severe emotional distress from an event like that and, in fact, it's undisputed that [M.K.] did suffer that. She testified to that.

The only testimony to the contrary ... or the only evidence to the contrary would be [M.K.'s] continued contact with [Doyle] and also the fact that she appeared cheerful while in [Doyle's] home.

That's a fairly minor point in the Court's mind, given the nature of the—this Axis I disorder that battered women tend to have where they—and I ... don't understand why this happens, we only know that it happens ...—it's something that the Court can certainly take notice of as it considers this issue of severe emotional distress.

The legislature's intended that the Court be allowed to use its experience [of] this nature, otherwise we would have to have a psychologist in on every one of these hearings. And so we don't know ... why, particularly, women tend to stay with batterers and so forth but they do. And ... it's usually something that requires some type of therapeutic intervention.

¶ 6 Doyle asserts that an Axis I clinical diagnosis is outside the information " 'generally known' " to a trial court judge and could not be considered without any evidence or expert testimony on the subject. *See* Utah R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

reasonably be questioned."). We conclude that, taken in context, the court's reference to "Axis I disorder" was not an attempt to bring in a clinical diagnosis through judicial notice but, rather, an allusion to an increasingly familiar psychological concept that the judge used simply to describe knowledge gleaned from his own experience.

¶ 7 The determination of witness credibility is a matter within the province of the finder of fact. *Iacono v. Hicken,* 2011 UT App 377, ¶ 28, 265 P.3d 116; *see also Hale v. Big H Constr., Inc.,* 2012 UT App 283, ¶ 16, 288 P.3d 1046 ("Assessing the credibility of a witness is within the trial court's domain."). "We are keenly aware that [finders of fact] are in the best position to make determinations about credibility and veracity." *Rawlings v. Rawlings,* 2010 UT 52, ¶ 45, 240 P.3d 754. Accordingly, due regard must be given to a court's assessment of whether a witness ought to be believed. Utah R. Civ. P. 52(a).

The Utah Supreme Court has recognized that in performing their duties as finders of fact [the judge or jurors] are the exclusive judges of the credibility of the evidence. In so doing, they may consider all of the facts affirmatively shown, as well as any unexplained areas, and draw whatever inferences may fairly and reasonably be drawn therefrom *in the light of their own experience and judgment.*

*State v. John,* 586 P.2d 410, 412 (Utah 1978) (emphasis added) (citation omitted). In other words, "[f]act finders are not required to divorce themselves of common sense, but rather should apply to facts which they find proven such reasonable inferences as are justified in the light of their experience as to the natural inclinations of human beings." *Commonwealth v. Russell,* 46 Mass.App.Ct. 307, 705 N.E.2d 1144, 1146 (1999) (citation and internal quotation marks omitted); *see also Peterson v. Peterson,* 374 N.J.Super. 116, 863 A.2d 1059, 1064 (N.J.Super.Ct.App.Div.2005) (explaining that "[c]ourts must consider the totality of the circumstances" in determining whether the harassment statute has been violated and that " 'a finding of a purpose to harass may be inferred from the evidence presented' and from '[c]ommon sense and

experience'" (second alteration in original) (citations omitted)).

¶ 8 In the case of a stalking injunction, the trial court is the finder of fact. Utah Code Ann. § 77-3a-101(5)(a) (LexisNexis 2012) ("If *the court* determines that there is reason to believe that an offense of stalking has occurred, an ex parte civil stalking injunction may be issued...." (emphasis added)). And judges, by virtue of the duties of their office, are regularly exposed to evidence of incidents of domestic violence and the persons involved in such incidents, including victims. For example, domestic violence may be a significant issue in the context of a request for a protective order or stalking injunction, a petition for divorce, or a trial on a criminal offense, such as assault (physical or sexual), abuse, or homicide. In presiding over these proceedings, a trial judge has many opportunities to become familiar with the behavioral interactions of people in abusive relationships. And although this experience alone does not qualify a judge to diagnose a particular medical or psychological condition, judges cannot be expected to "divorce themselves" from the knowledge they have attained by their experience. *See Russell*, 705 N.E.2d at 1146. Indeed, the trial judge in this case recognized that by tasking judges with the responsibility to determine whether a stalking injunction ought to issue, the "legislature[ ] intended that the Court be allowed to use its experience [of] this nature."

¶ 9 The trial judge here did exactly that. He heard M.K.'s testimony that she felt compelled to stay in a relationship with Doyle, that Doyle repeatedly used force to engage her in sexual activity after she physically and verbally refused him, and that she suffered emotional distress as a result of Doyle's behavior. Doyle attempted to undercut this testimony by pointing out that after the abuse occurred, M.K. continued a consensual relationship with him and seemed cheerful in his presence. Based on the trial judge's explanation as a whole, it is reasonable to conclude that the judge rejected this argument as "a fairly minor point" of contention because he viewed such behavior as not unusual in victims of abuse. That assessment was clearly informed by the judge's frequent exposure to the conduct of persons in rela-

tionships involving domestic violence in the course of his judicial duties. Applying this experience, the judge determined that M.K.'s behavior—continuing a relationship with Doyle after he abused her—was common enough among victims of domestic violence that it did not materially undermine his overall judgment that M.K. was a credible witness when she testified that she suffered severe emotional distress from Doyle's continued contact with her.

¶ 10 Under the circumstances, it seems reasonable to conclude that the judge's labeling of his understanding of the behavior of victims of domestic violence as an "Axis I disorder that battered women tend to have" did not amount to judicial notice that M.K. was actually suffering from the condition. Instead, it is clear that the judge made his credibility determination after hearing her testimony and seeing her demeanor and then refining his judgment in the context of other evidence and in light of his experience with the behavior of victims of domestic violence. It was that experience that enabled the judge to reconcile M.K.'s seemingly inconsistent behavior with her testimony that she was emotionally distressed by Doyle's abuse and coercion. And although the judge inartfully labeled it with a DSM tag, he sufficiently stated that his finding was based on his experience: "[T]he Court [is] allowed to use its experience in [cases involving domestic violence], otherwise we would have to have a psychologist in on every one of these hearings. And so we don't know ... why, particularly, women tend to stay with batterers and so forth but they do." A trial court is well equipped to make this kind of determination due to its opportunity to "view[ ] the witnesses firsthand, to assess their demeanor and to consider their testimonies in the context of the proceedings as a whole." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 12, 271 P.3d 837; *State v. Graham*, 2011 UT App 332, ¶ 32, 263 P.3d 569 ("The fact that the evidence may be in conflict does not undermine its sufficiency to support the finding. It is within the province of the ... finder of fact[ ] to make credibility determinations.").

¶ 11 Accordingly, we affirm. Because M.K. was granted attorney fees below and

has prevailed on appeal, we grant her request for attorney fees incurred on appeal. *See Valcarce v. Fitzgerald,* 961 P.2d 305, 319 (Utah 1998) ("[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." (citation and internal quotation marks omitted)). We remand to the district court to determine the amount of that award.

DAVIS, Judge (concurring in part and dissenting in part):

¶ 12 I agree with the majority that M.K.'s ongoing relationship with Doyle did not preclude her from obtaining a civil ·stalking injunction against him. However, I disagree with the majority's characterization of the trial court's comments regarding "Axis I disorder" as a mere credibility determination.

¶ 13 In weighing the evidence before it, the trial court took judicial notice of an "Axis I disorder that battered women tend to have where they . . . tend to stay with batterers." By using this fact as a basis for disregarding evidence that .M.K. had "continued contact" with Doyle after he abused her and "that she appeared cheerful while in [Doyle's] home," the trial court implicitly determined not simply that this evidence was not credible or was outweighed by other evidence, but that M.K. suffered from a psychological disorder that caused her to behave in a particular way.

¶ 14 While the trial judge could appropriately judge the parties' credibility "in the light of [its] own experience and judgment," *State v. John,* 586 P.2d 410, 412 (Utah 1978), the trial court went too far in this case by attributing a psychological disorder to M.K. without being presented with any evidence that she actually suffered from that disorder. The majority considers the trial court's "Axis I disorder" label to have been simply "inartful" and asserts that the trial court was merely acknowledging the disorder rather than diagnosing M.K. with it. I do not think the trial court's comments can be dismissed so easily.

¶ 15 While it is possible that the trial court did not actually intend to diagnose M.K., its comments strongly suggest that it considered her to be suffering from an Axis I disorder.

While the court may have rejected the evidence contradicting M.K.'s claims of emotional distress even without such a diagnosis, its "inartful" language referring to a specific psychological disorder and implying a diagnosis suggests a misunderstanding of the bounds of judicial notice. By dismissing this language as inconsequential and attempting to interpret what the court meant rather than relying on what it said, I fear that the majority may have opened the door for judges to rely on their own knowledge of psychology in making factual determinations rather than on the evidence presented to them. *Cf. Brown v. Sandy City Appeal Bd.,* 2014 UT App 158, ¶¶ 19–20, 330 P.3d 767 (determining that it was inappropriate for an appeals board to play "armchair psychologist" by finding that certain behaviors exhibited by an employee were consistent with a psychological disorder the employee had been diagnosed with); *Allied Constr. & Dev., Inc. v. Labor Comm'n Appeals Bd.,* 2013 UT App 224, ¶¶ 6–7, 310 P.3d 1230 (holding that an administrative law judge's determination that a panel could not have been removed without knocking over a shovel leaning against it "was a product of speculation" because the judge "relied on her own view of physics to decide the case").

¶ 16 It is my opinion that, having been presented with no evidence regarding the symptoms of an Axis I disorder or any evidence indicating that M.K. in fact suffered from any such symptoms, the trial court's stated basis for rejecting the evidence that contradicted M.K.'s claims of emotional distress is unsupported. We have no way of knowing whether the trial court would have weighed the evidence in the same way had it not applied its own knowledge of psychology to decide the case. I would therefore remand for the trial court to determine, without attributing the Axis I disorder to M.K., whether the evidence supported findings on the necessary elements of the stalking statute.