2014 UT App 31

**Brett PEREZ, Petitioner,**

v.

**SOUTH JORDAN CITY and South Jordan City Appeal Board, Respondents.**

**No. 20100545–CA.**

Court of Appeals of Utah.

Feb. 6, 2014.

Ryan B. Hancey, Salt Lake City, Attorney for Petitioner.

Camille N. Johnson and Maralyn M. English, Salt Lake City, Attorneys for Respondents.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judges GREGORY K. ORME and JAMES Z. DAVIS concurred.

VOROS, Judge:

¶ 1 Officer Brett Perez, a South Jordan City police officer, engaged in a high-speed chase in May 2009. During that chase, Perez failed to activate his lights and siren while speeding and later failed to activate his siren while passing through a red light at an intersection. After reviewing the incident and three other disciplinary matters in Perez's file—all from the preceding fourteen months—South Jordan Police Chief Lindsey Shepherd terminated Perez. The South Jordan City Appeal Board affirmed his termination. Perez seeks review of the Board's decision. We decline to disturb that decision.

## BACKGROUND

### The Chase

¶ 2 While on patrol at 1:30 a.m. on May 28, 2009, Officer Perez responded to a radio call reporting a suspicious vehicle leaving a South Jordan shopping complex. Perez intercepted and attempted to pull over the vehicle. When the driver refused, Perez followed the fleeing vehicle into a cul-de-sac. Perez left his car and approached the vehicle on foot, drawing his weapon and ordering the driver to stop. After briefly retreating, the driver again attempted to leave the cul-de-sac. He drove directly at Perez, who was standing in the middle of the street pointing his gun at the car. Perez dove out of the way to avoid being hit.

¶ 3 Officer Jared Nichols, who had come to provide support, sped after the fleeing vehicle. By the time Perez returned to his car, the fleeing driver had driven five blocks west through a residential neighborhood and turned north · onto 3200 West, a wider through-street. Knowing that he would need to drive at high speeds to catch up with Nichols and the fleeing vehicle, Perez opted not to follow their route through the residential neighborhood. Instead, he turned north onto 2700 West, another through-street running parallel to 3200 West, hoping that if the vehicle turned east he would be positioned to intercept it. To catch up, Perez sped up to seventy miles per hour, well in excess of 2700 West's speed limit of thirty five miles per

hour. As he continued at high speeds down 2700 West, parallel to Nichols and the fleeing vehicle, Perez did not activate either his police lights or his siren.

¶ 4 Perez and Nichols maintained radio contact, but Perez was unable to identify Nichols's location. The fleeing driver eventually reversed course, heading south on 3200 West and then turning east onto 7800 South. Perez was there waiting. He stopped in the middle of the street facing the oncoming vehicle and turned on his emergency lights, but did not activate his siren. The fleeing vehicle and Nichols both passed Perez, and Perez turned around to follow. The officers trailed the fleeing vehicle as it turned north on 2700 West. As the chase passed through the intersection of 7800 South and 2700 West, Perez still had not activated his siren. As the chase entered the intersection on a red light, a vehicle approaching northbound on 2700 West passed through the intersection and immediately pulled over to avoid a collision.

¶ 5 The chase ended dramatically a few minutes later. Nichols and Perez caught up with the fleeing vehicle on a dead-end street. The two officers rammed their cars into the vehicle to stop it from moving. Nichols's vehicle and the fleeing vehicle were "crushed together," and the drivers' windows were "very close" to each other. Perez left his vehicle, drew his weapon, pointed it at the driver of the fleeing vehicle, and ordered him several times to stop. When the driver "continued to try to escape" and "started towards his open driver window," Nichols fired twice at the driver, killing him.

### Perez's Termination and the Board's Review

¶ 6 The South Jordan City Police Department's Pursuit Review Committee issued a memorandum discussing Perez's involvement in the chase. The committee considered whether Perez should have activated his emergency lights, siren, and camera while moving at seventy miles per hour in a thirty-five-miles-per-hour zone. It "concluded that he should have had his camera operating due to the nature of the incident." The committee also considered whether Perez had violated department policy or broken the law by following Nichols and the fleeing suspect through the intersection of 7800 South and 2700 West without activating his siren. "[A]ccording to policy," the committee observed, Perez should have activated his siren before going through a red light. But the committee recognized that Perez's failure to activate his siren created "no danger to other motorists, ... because Officer Nichols had just gone through" the same light ahead of Perez.

¶ 7 After reviewing the Pursuit Review Committee's memorandum, Chief Shepherd wrote Perez a pre-disciplinary-hearing letter informing him that he was "subject to potential disciplinary action" for failing to "properly perform [his] duties in a manner that [would] maintain the highest standards of efficiency in carrying out the [department's] goals and objectives" and failing to "carry out [his] duties completely and without delay, evasion, or neglect." After the hearing, Chief Shepherd wrote Perez again to inform him that he had been terminated.

¶ 8 In his second letter, Chief Shepherd described two offenses that established grounds for Perez's termination. The offenses differed from those Chief Shepherd had described in his pre-disciplinary-hearing letter. First, "[w]hile paralleling, Officer Perez did not utilize lights, siren and camera while exceeding the speed limit." Second, "[w]hile in the back up role, Officer Perez entered the intersection of 7800 South 2700 West without utilizing his audible signal (siren)." Chief Shepherd's termination letter also referred to three prior "disciplinary actions" on Perez's record. In April 2008 Perez had been suspended "for willfully engaging in a vehicle pursuit against department policy." In July 2008 Perez had been demoted "for showing a lack of veracity during a supervisor inquiry." At that time, Perez was "advised that ... although the actions leading to his demotion did not justify termination at that time, any further violation of City or Department Policy would result in termination." Finally, in May 2009 Perez was "[v]erbally counseled for excessive speed (83–35) while en-route to a non priority call. (Noise complaint)."

¶ 9 The termination letter concluded that Perez's actions "in the May 28, 2009 pursuit, as well as the cumulative prior actions resulting in formal discipline, constitute cause for disciplinary action." The letter stated that Perez's "most recent conduct ... is another instance of an on-going failure to exercise proper judgment" and that Perez's "repeated problems involving poor judgment and policy violations compromise [his] ability to function as a police officer."

¶ 10 Perez appealed his termination to the South Jordan City Appeal Board. After a lengthy hearing, the Board affirmed Chief Shepherd's decision to terminate Perez. Perez then sought this court's review of the Board's decision. Concluding that Perez missed the thirty-day deadline for filing a petition, we dismissed that petition for lack of jurisdiction. *Perez v. South Jordan City,* 2011 UT App 430, ¶ 1, 268 P.3d 877. Perez appealed, and the Utah Supreme Court reversed, holding that Perez had timely appealed. *See Perez v. South Jordan City,* 2013 UT 1, ¶¶ 24–25, 296 P.3d 715. The court remanded the case to us to consider the merits of Perez's petition. *Id.*

### ISSUES AND STANDARDS OF REVIEW

¶ 11 Perez contends that the Board erred in two ways. First, he asserts that the Board erred in finding that he engaged in a "pursuit" on 2700 West as he attempted to rejoin Nichols and catch the fleeing vehicle. Second, he asserts that the Board erred in concluding that his termination was proportional to his misconduct and consistent with past department discipline for similar offenses. The scope of our review is confined to the record before the Board, and we review the Board's order only to determine whether the Board "abused its discretion or exceeded its authority." Utah Code Ann. § 10–3–1106(6)(c) (LexisNexis 2012); *accord Nelson v. City of Orem,* 2013 UT 53, ¶¶ 29–30, 309 P.3d 237.

### ANALYSIS

#### I. Pursuit

¶ 12 Perez first contends that the Board abused its discretion when it determined that

he engaged in a pursuit as he sped to rejoin Nichols.[1] Perez argues that the distance between himself and the fleeing vehicle and the fact that he had only a "vague, general idea of the suspect's location" refute the Board's pursuit finding. He also argues that the Board's decision, the Pursuit Review Committee's report, and South Jordan's pursuit training program use contradictory definitions of the term "pursuit."

¶ 13 The City responds that Perez's actions fall clearly within South Jordan City's Vehicle Pursuit Policy. That policy defines "vehicular pursuit" as "an active attempt by a law enforcement officer in an authorized emergency vehicle to apprehend fleeing suspect(s) who are attempting to avoid apprehension through evasive tactics." Because Perez "was in a 'vehicular pursuit' as ... defined in the Pursuit Policy," the City argues, the Board did not abuse its discretion when it found that Perez had engaged in a pursuit "[w]hile speeding on 2700 West ... to apprehend the fleeing suspect."

¶ 14 The Board based its order on section 41–6a–212 of the Utah Code and South Jordan Police Department General Order 41.2. Section 41–6a–212 of the Utah Code grants certain privileges to operators of authorized emergency vehicles. These include the privilege to "exceed the maximum speed limits" and the privilege to "proceed past a red or stop signal ... after slowing down as may be necessary for safe operation." Utah Code Ann. § 41–6a–212(2) (LexisNexis 2010). These privileges are available when an emergency vehicle is "responding to an emergency call," engaged "in the pursuit of an actual or suspected violator of the law," or "responding to ... a fire alarm." *Id.* § 41–6a–212(1).

¶ 15 However, the statute's privileges apply to emergency vehicles "involved in any vehicle pursuit" only when the driver "sounds an audible signal" and "uses a visual signal with emergency lights." *Id.* § 41–6a–212(4)(a)(i), (ii). The statute requires emer-

---

1. Perez does not challenge the Board's finding that he violated department policy by failing to activate his siren before entering the intersection at 7800 South and 2700 West.

gency vehicles exercising these privileges while not involved in a pursuit to *either* "sound[ ] an audible signal" or "use[ ] a visual signal with emergency lights." *Id.* § 41–6a–212(3)(a)(i), (ii). And the statute permits emergency vehicles "engaged in normal patrolling activities with the purpose of identifying and apprehending violators" to "exceed the maximum speed limit" without activating either an audible signal or a visual signal. *Id.* § 41–6a–212(3)(b).

■ ¶ 16 In sum, the requirements for a police vehicle to exceed speed limits differ depending on the situation: (1) the driver of a police vehicle involved in a vehicle pursuit must activate both lights and siren; (2) the driver of a police vehicle "not involved in a vehicle pursuit" must activate either lights *or* siren; and (3) the driver of a police vehicle engaged in "normal patrolling activities" need · not activate either. Neither party contends that Perez's conduct fits into the second category. The question, then, is whether the Board abused its discretion in concluding that Perez was engaged in a vehicle pursuit and not in normal patrolling activities.

¶ 17 "Vehicular pursuit" is a defined term. South Jordan Police Department General Order 41.2 defines department policies "regarding Routine, Urgent, or Emergency call response ... [and] Vehicle Pursuits." General Order 41.2, South Jordan Police Department (Mar. 15, 2005). It defines "vehicular pursuit" as "[a]n active attempt by a law enforcement officer in an authorized emergency vehicle to apprehend fleeing suspect(s) who are attempting to avoid apprehension through evasive tactics." *Id.* § 41.2.2(21). It also defines "paralleling" as "[p]articipating in the pursuit by proceeding in the same direction and maintaining approximately the same speed while traveling on an alternate street or highway that parallels the pursuit route." *Id.* § 41.2.2(14).

¶ 18 The Board concluded that because Perez actively attempted to apprehend a fleeing suspect when he sped north on 2700 West, his actions fell within the department's definition of vehicular pursuit, quoted above. *See id.* § 41.2.2(21). The Board acknowledged Perez's argument that he was not

actually pursuing the suspect but concluded that "Perez's interpretation of the traffic code would create an exception ... which swallows the rule." Perez was engaged in a high-speed chase in an effort to apprehend a suspect. The Board reasoned that if that effort falls within the definition of "normal patrolling activities," it could not "fathom when a pursuit could ever occur, as opposed to a 'normal patrolling activity.'" Given the statute and the written pursuit policy, we determine that the Board neither "abused its discretion" nor "exceeded its authority" in reaching this conclusion. *See* Utah Code Ann. § 10–3–1106(6)(c) (LexisNexis 2012).

■ ¶ 19 Perez argues that the report prepared by the Pursuit Review Committee provides evidence that four of the committee members "concluded Perez was not engaged in a pursuit while traveling northbound on 2700 West." In the report, several committee members seemed to confine the term "pursuit" to Officer Nichols's efforts to apprehend the suspect. One committee member, for example, described Perez as "finally locat[ing] the pursuit at about 3200 West"; another stated that Perez "made a judgment call to proceed in a different direction than the pursuit itself." However, the fact that the committee members used the term "pursuit" narrowly to refer to a single officer's efforts to apprehend a suspect does not foreclose a finding that Perez was also engaged in a "pursuit" of the same suspect. A paralleling officer, for example, is "participating in the pursuit" even though he is traveling on a road that only "parallels the pursuit route." *See* General Order 41.2, § 41.2.2(14). In any event, the fact that members of the Pursuit Review Committee may have used the term "pursuit" in a more restrictive sense than the department's pursuit policy does not invalidate the Board's conclusion that Perez was engaged in a pursuit while driving north on 2700 West.

■ ¶ 20 Perez also argues that the department's pursuit training defined the term "pursuit" to refer to "an officer behind the vehicle that's trying to get away." Perez testified that according to the department's training, officers are not "involved in the

pursuit when [they are] not present." Based on Perez's testimony, the definition of "pursuit" he learned—and taught—in training was narrower than the definition contained in the department's policy manual, applied by Chief Shepherd, and approved by the Board. While we recognize the conflict between the definition Perez testified he learned during training and the definition contained in the department's policy, the Board heard testimony regarding both definitions and found that Perez engaged in a pursuit while "speeding northbound on 2700 West." Recognizing that reasonable minds could differ on the question, we cannot say that in weighing conflicting testimony and applying the police department's written pursuit policy, the Board either abused its discretion or exceeded its authority. *See* Utah Code Ann. § 10–3–1106(6)(c); *see also Davis v. Department of Workforce Servs.*, 2012 UT App 158, ¶ 6, 280 P.3d 442 ("[W]e defer to the Board's assessment of credibility and resolution of conflicting evidence." (citation and internal quotation marks omitted)). We therefore decline to disturb the Board's determination that Perez engaged in a pursuit.

## II.   Termination

¶ 21 Perez also contends that termination was disproportionate to his misconduct and inconsistent with "the discipline the City meted out to other officers for similar misconduct." To demonstrate the inconsistency of the punishment he received, Perez introduced a chart listing instances of South Jordan police officers committing similar violations and the discipline each officer received for the violation.

¶ 22 The City responds that "neither the Chief nor the Appeal Board were sanctioning [a] single incident." "Instead, Perez's termination was a culmination of discipline resulting from several instances of misconduct." In light of Perez's disciplinary history, the City argues, "termination was discipline proportional to Perez's misconduct." The City adds that Perez failed to present evidence demonstrating that his discipline was inconsistent with discipline the City imposed upon similarly situated officers in the past.

¶ 23 The Board based its decision on two violations Perez committed on May 28: his failure to activate his siren and lights while in pursuit and his failure to activate his siren when entering an intersection through a red light. We reject Perez's challenge to the pursuit violation, *see supra* Part I, and as noted above Perez does not challenge the Board's finding on the lesser intersection violation, *see supra* ¶ 12 n. 1. We therefore analyze the severity and consistency of Perez's discipline in light of his two May 28 violations and his disciplinary history.

¶ 24 In assessing whether employee misconduct warrants the sanctions imposed, this court has divided the inquiry into two prongs: (1) Is the sanction "proportional"? and (2) Is the sanction "consistent with previous sanctions imposed by the department pursuant to its own policies"? *Kelly v. Salt Lake City Civil Serv. Comm'n*, 2000 UT App 235, ¶ 21, 8 P.3d 1048; *see also, e.g., Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 16, 116 P.3d 973; *Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 761 (Utah Ct.App.1997). But this two-pronged inquiry "should not be viewed as a stand-alone test for reviewing the validity of the Board's decision relating to employee discipline." *Nelson v. City of Orem*, 2013 UT 53, ¶ 29, 309 P.3d 237. Therefore, we "need not apply a rigid two-part test in every case to scrutinize a city appeals board's decision." *Id.* ¶ 30. Instead, we consider proportionality and consistency insofar as those standards aid our determination of whether the Board "abused its discretion or exceeded its authority." Utah Code Ann. § 10–3–1106(6)(c) (LexisNexis 2012); *see also Nelson*, 2013 UT 53, ¶ 29, 309 P.3d 237.

¶ 25 When an appeal board examines the proportionality of a sanction, it "give[s] deference to the chief's choice of punishment because, as the head of the [department], he is in a position to balance the competing concerns in pursuing a particular disciplinary action." *Harmon*, 2005 UT App 274, ¶ 17, 116 P.3d 973. An appeal board's deference to the department head should be broad—even "the use of progressive discipline," for example, "is committed to the Chief's discretion, based on the Chief's deter-

mination of the severity of the offense." *Lucas,* 949 P.2d at 762.

¶ 26 When challenging a sanction's consistency, "the disciplined employee must first make out a prima facie case by pointing to specific instances or statistics, rather than relying on an unsupported assertion of inconsistent punishment." *Kelly,* 2000 UT App 235, ¶ 30, 8 P.3d 1048. Perez need not show that the disparity between his treatment and the treatment of other employees "is motivated by . . . animosity." *See id.* But he must, "at a minimum, carry the burden of showing some meaningful disparity of treatment between [himself] and other *similarly situated* employees." *See id.* (emphasis added).

¶ 27 Our review of the Board's affirmance of Chief Shepherd's decision is guided by *Phillips v. South Jordan City,* 2013 UT App 183, 307 P.3d 659. Phillips worked for the same department and was terminated by the same police chief for violating the same general order as Perez. *See id.* ¶¶ 4–5. When Phillips appealed, the same Appeal Board found that "Phillips's conduct violated General Order 41.2.1 and his [pursuit] training," "determined that his disciplinary history fully justified the termination of his employment," and "affirmed Chief Shepherd's decision to terminate Phillips's employment." *Id.* ¶ 6.

¶ 28 Phillips petitioned for this court's review, asserting that the discipline he received was "disproportionate to his conduct" and "inconsistent with sanctions imposed on other officers in similar circumstances." *Id.* ¶¶ 16, 18. Like Perez, Phillips included a chart "describ[ing] instances of conduct by . . . other officers, which resulted in lesser discipline than Phillips's termination." *Id.* ¶ 18.

¶ 29 This court held that Phillips failed to demonstrate disproportionality or inconsistency. *Id.* ¶¶ 16, 18. In addressing the proportionality of his discipline, Phillips failed to refute the Board's finding that his disciplinary record provided evidence of "a pattern of poor judg[ment]." *Id.* ¶ 17 (alteration in original) (internal quotation marks omitted). Phillips also did not include "the performance histories or length of service with the City for each of the six officers" appearing in his comparison chart, "which information may explain or justify the lesser discipline." *Id.* ¶ 18. This court emphasized the importance of "detailed information pertinent to a determination of whether the circumstances (not just the actions) of other officer sanctions were similar." *Id.*

¶ 30 Like Phillips, Perez argues that his termination was not proportional to the violations he committed. But also like Phillips, Perez has failed to demonstrate the inconsistency of his discipline by identifying similarly situated officers who received more lenient punishments. A disciplined employee must do more than show that other employees received lighter punishments for similar offenses. The disciplined employee must identify employees in similar circumstances—employees with similar disciplinary histories and service time, for example—who received lighter punishments for similar offenses. *See Kelly v. Salt Lake City Civil Serv. Comm'n,* 2000 UT App 235, ¶ 30, 8 P.3d 1048; *see also Phillips,* 2013 UT App 183, ¶ 18, 307 P.3d 659. Phillips's chart, which listed South Jordan police officers who had committed traffic violations and the discipline they had received, failed to provide that level of detail. *See Phillips,* 2013 UT App 183, ¶ 18, 307 P.3d 659.

¶ 31 Perez's chart is similar in this respect. It provides the name of each violation, the name of the officer committing the violation, the date of the violation, and the discipline the officer received for each violation. But as the Board emphasized, Perez submitted his chart "without any additional evidence, such as testimony fully describing any of the traffic incidents described." We note that the chart also contained no details of the officers' disciplinary histories, making it impossible to determine whether the officers were first-time offenders or, like Perez, repeat offenders of department policy. In short, the Board found that Perez failed to provide information detailing the discipline levied against *similarly situated* officers and that Perez therefore failed to establish a prima facie case of inconsistent discipline.

¶ 32 On this record and in view of the virtually identical facts of *Phillips,* we con-

clude that the Board did not abuse its discretion or exceed its authority in finding that Perez's termination was not inconsistent with past department discipline. See Utah Code Ann. § 10–3–1106(6)(c).

¶ 33 Perez also argues that the police department improperly considered evidence that had been purged from his employee file. But for the purged evidence, Perez reasons, Chief Shepherd "certainly would not have demoted Perez" in July 2008 or "terminated his employment" in May 2009.

¶ 34 This argument proceeds on a faulty premise. The Board relied on three prior disciplinary actions: the April 2008 suspension, the July 2008 demotion, and the May 2009 oral admonition. None of these prior disciplinary actions had been purged from Perez's file. Perez now attempts to belatedly challenge the April 2008 suspension on the ground that it was tainted by Chief Shepherd's reliance on purged prior discipline. This line of attack is unavailing for at least two reasons. First, the April 2008 suspension became final long ago. The record of that case is not before us, and Perez has suggested no procedural path to collaterally attack it now. Second, the Board rejected as a factual matter Perez's contention that the prior purged discipline affected his April 2008 sanction. Given the lack of contrary evidence and the Board's deference to Chief Shepherd—who was "in a position to balance the competing concerns in pursuing a particular disciplinary action," see Ogden City Corp. v. Harmon, 2005 UT App 274, ¶ 17, 116 P.3d 973—we conclude that the Board did not abuse its discretion or exceed its authority in finding that Perez's purged disciplinary history played no role in his termination. See Utah Code Ann. § 10–3–1106(6)(c) (LexisNexis 2012).

## CONCLUSION

¶ 35 When Perez sped north on 2700 West to rejoin Nichols and to apprehend the fleeing vehicle, he engaged in a vehicular pursuit according to the police department's own definitions. Those definitions provide reasonable support for the Board's determination that Perez was engaged in a pursuit when he failed to activate his lights and siren. The

Board did not abuse its discretion when it found that Perez's two May 28 violations, along with his disciplinary history, provided adequate support for Chief Shepherd's decision to terminate him. We therefore decline to disturb the Board's order affirming Perez's termination.