## 2023 UT App 76

## THE UTAH COURT OF APPEALS

CLARK ANDERSON,
Appellant,
*v.*
DAGGETT SCHOOL DISTRICT AND STATE OF UTAH,
Appellees.

Opinion
No. 20210155-CA
Filed July 20, 2023

Eighth District Court, Manila Department
The Honorable Clark A. McClellan
No. 200800001

Julie J. Nelson and Tracey M. Watson,
Attorneys for Appellant

Sean D. Reyes and Peggy E. Stone,
Attorneys for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

TENNEY, Judge:

¶1     Clark Anderson taught in the Daggett School District (the District) for 24 years. After the series of incidents described below, the District terminated his employment. Anderson believed his termination was unlawful, so he challenged it. At the conclusion of a two-day evidentiary hearing, a designated hearing officer (the Hearing Officer) upheld the termination.

¶2     Anderson then filed a petition asking this court to review the Hearing Officer's decision. After the District asserted that we lacked jurisdiction, we transferred the matter on our own motion to the district court. Once there, however, the District asserted that

the district court lacked jurisdiction too. The district court agreed with the District and dismissed for lack of jurisdiction.

¶3     Anderson now appeals, and the District again asserts that we lack jurisdiction. As set forth below, we first conclude that we have jurisdiction to review the Hearing Officer's decision. We accordingly vacate our prior order transferring the matter to the district court, thus reinstating the initial petition for review that Anderson filed in this court. From there, we next conclude that the Hearing Officer applied the wrong standard when reviewing Anderson's termination. We accordingly set aside the Hearing Officer's decision and instruct the Hearing Officer to reassess Anderson's termination under the correct standard.

BACKGROUND

¶4     The District serves a rural community in northeastern Utah on the Wyoming border. The District has two elementary schools and one combined junior high/high school that is called Manila High School. Manila High School has an average class size of twelve students.

¶5     Anderson began teaching for the District in 1995 as a career educator.[1] His most recent teaching assignment was at Manila High School, where he taught math, coached golf, and acted as a substitute bus driver.

---

1. A "career educator" is "a licensed employee who has a reasonable expectation of continued employment under the policies of a local school board." Utah Code § 53G-11-501(2). Career educators have a property right in their employment and are entitled to due process before dismissal. *Id.* § 53G-11-512(2)(a); Utah Const. art. I, § 7; U.S. Const. amend. XIV, § 1; *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

¶6     Toward the end of the 2018–19 school year, Anderson and the Manila High School principal (Principal) decided on a new math textbook to be purchased for the following school year. Anderson later testified that he was "entirely sure we had ordered [the new textbooks]." In May 2019, on or near the final day of school, Anderson told his students that he did not want to see their current math textbooks back in class and that the students "were welcome to destroy or burn the textbooks." He also said, "[I]f you want, you can set [the current math textbooks] back there on the shelf, but if you bring [them] to me[,] . . . I'll just lower your grade." Anderson later claimed that his statement about lowering grades was a joke, but two of his students testified that it was "unclear" if "Anderson was serious or joking" and that they "were not willing to take any chances with their grades." A group of at least four students subsequently burned the math textbooks, an event that was captured on video.

¶7     There was a "general practice" in the District in which students were "required to take a [w]ithdrawal [s]lip to each of their teachers on the final day of school." That withdrawal slip listed each class on the student's schedule and had spaces for the teacher to indicate whether the student was returning a book in damaged condition. If "there was no property to be returned or the property was returned in suitable condition, the teacher would make a dash mark in the space."

¶8     In late May 2019, the District's superintendent (Superintendent) became aware that the current math textbooks from Anderson's classes had not been returned to Manila High School. Superintendent worked with Manila High School's secretary to check the withdrawal slips for any record of the textbooks having been returned. On review, the withdrawal slips for Anderson's classes showed "dash marks" in the spaces and were initialed by Anderson "in every instance," thus indicating that "there was no property to be returned or [that] the property was returned in suitable condition."

¶9 Superintendent asked Principal to investigate the textbook matter further. Principal communicated with Anderson, who admitted that he did not have his students return their math textbooks. When Principal informed Anderson that there was a process to dispose of District textbooks, Anderson responded that "he knew it was hard to get rid of them." Principal then told Anderson they needed to attempt to recover the textbooks. But Anderson later testified that he did not understand this to mean that he, personally, "was supposed to attempt to retrieve any textbooks." The District was eventually able to recover just a few of the textbooks.

¶10 During the textbook investigation, Principal informed Superintendent of another concern regarding Anderson, namely, that Anderson had encouraged his students to "sluff class" on certain occasions. Principal's daughter, who was a student of Anderson's at Manila High School, informed Principal that "Anderson said if two students or less showed up for class, he would not give the class an assignment for the day." Students at Manila High School participated in many extracurricular activities that led to excused absences for involved students. Students who testified at Anderson's hearing said that he "led them to believe that they should skip class if most of the kids were attending school-sponsored events away from the school to avoid the whole class receiving an assignment." Principal testified that "it's kind of up to the teacher" whether to give assignments on days in which many students were absent. Anderson explained that "he told the students the policy so they could decide for themselves" whether to attend class on days when several students would be absent.

¶11 Based on these incidents, Superintendent determined that Anderson "had committed substantial violations" of District policy, and in June 2019 Anderson received a letter, signed by Superintendent, that indicated Superintendent's intent to

terminate Anderson's employment.[2] The letter concluded that the destruction of District property, the unethical use of the grading policy, and the encouragement for students to skip school all "constituted unprofessional behaviors disrupting the ethical and legal operations of the [D]istrict." The letter also concluded that "refusing to act on [Principal's] verbal directive" to retrieve the math textbooks "constituted insubordination."

¶12 An informal conference was held in July 2019 with Anderson, Superintendent, Principal, a Utah Education Association representative, and another District employee. "The conference was not cordial," and Superintendent "raise[d] additional allegations, which were not raised" in the intent-to-terminate letter. Anderson asked to be reinstated, but Superintendent instead sent Anderson another letter in late July rejecting his request and now including additional allegations "that strengthen[ed] the District's position and resolve to terminate." Superintendent memorialized these additional allegations in an August 2019 amended termination notice.[3]

---

2. Despite career educators' reasonable expectation of continued employment, school districts have authority to dismiss career educators from their positions. Utah Code §§ 53G-11-512, -513. When doing so, school districts must provide due process, including a "fair hearing" if the employee requests one. *Id.* §§ 53G-11-512(2)(a), -513(5)(e).

3. The additional allegations were that Anderson (1) failed to add his wife and children to the bus manifest when they traveled on a school bus to golf tournaments with Anderson and the golf team; (2) used the school bus for personal business when he diverted the bus "less than 600 yards from the highway" to drop his dog off at a veterinarian during a school trip; (3) asked a fellow teacher, rather than Superintendent, to sign his educator license

(continued…)

¶13 Under Utah law, Anderson had a "right to a fair hearing" upon receiving this termination notice. Utah Code § 53G-11-513(5)(e) (2020). And a provision in the Utah Code allowed the District to "delegate its authority to a hearing officer to make decisions relating to the employment of an employee which are binding upon both the employee and the board." *Id.* § 53G-11-515(1)(c) (2020). Anderson and the District participated in a formal hearing before the Hearing Officer, as authorized by statute, in early 2020. *See id.* § 53G-11-515(a), (c). The parties submitted exhibits, called witnesses (including Anderson, who testified in his own behalf), and were given opportunities to cross-examine each witness. Counsel also offered opening and closing statements. After closing argument, Anderson's counsel told the Hearing Officer that "the questions about whether, in addition to proving a violation of [District] policy, employees are entitled to consistent application of the law and entitled to review of the proportionate nature of the level of discipline as it relates to what they've been . . . accused of doing, I think those are very well-settled principles in Utah law." At the close of the hearing, the Hearing Officer said that he did "not require any post-hearing briefing" and took the matter under advisement.

¶14 On January 31, 2020, the Hearing Officer issued a written and "final decision" to terminate Anderson. The Hearing Officer began by noting that "[c]ases in Utah are relatively scant on employment law specifically involving the termination of educators." But in the Hearing Officer's view, a 2016 federal district court case from the District of Utah—*Hays v. Park City School District*, 214 F. Supp. 3d 1162 (D. Utah 2016)—"provided a restatement of current law related to due process requirements in the context of terminating an educator." Relying on that case, the Hearing Officer concluded that to overcome the District's decision

---

renewal; and (4) failed to complete mandatory Utah High School Activities Association coaching trainings.

to terminate him, Anderson was required to "demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *See Hays*, 214 F. Supp. 3d at 1182.

¶15   Applying that standard, the Hearing Officer concluded that the "decision to terminate Mr. Anderson [did] not shock the conscience and did not unlawfully deprive [him] of any substantive rights." The Hearing Officer found that Anderson violated policies when he knowingly "circumvent[ed]" the District's book disposal process by instructing students to destroy or burn math textbooks and then "affirmatively hid[ing]" the books' disposal by omitting material information from the withdrawal slips. The Hearing Officer also found that Anderson's lack of response to directives was "unjustified" and that Anderson had displayed a "rogue attitude about rules and expectations" by encouraging students to skip class, failing to complete the bus manifests, and refusing to ask Superintendent to sign his educator license renewal. From all this, the Hearing Officer concluded that the "District's determination to terminate Mr. Anderson has a rational basis and shall not be disturbed by the Hearing Officer."[4]

---

4. The Hearing Officer did, however, find in Anderson's favor on some of the allegations. The Hearing Officer concluded that Anderson's failure to include his wife and children on the bus manifest, in isolation, did "not rise to the level of a disciplinable offense"; that "[d]elivering a dog to the veterinarian was not a violation of District policy"; and that while asking another teacher, rather than Superintendent, to sign his educator license renewal "demonstrated poor judgment and provides further evidence of Mr. Anderson's cavalier disposition and attitude toward rules," it "did not, by itself, constitute insubordination" such that it was a "disciplinable offense."

¶16 At the time, the same statute in the Utah Code that allowed school boards to delegate their authority to hearing officers also stated that it did "not limit the right of the board or the employee to appeal to an appropriate court of law." Utah Code § 53G-11-515(1)(d) (2020). But that provision did not define or identify what court was an "appropriate court of law" for such an appeal.

¶17 Still believing that he had been wrongfully terminated, Anderson filed a timely petition for review with this court in which he challenged the Hearing Officer's decision. The District moved for summary disposition, arguing that this court did not have jurisdiction over the matter. In response, Anderson stated that he did "not oppose [the] motion." But he then requested that, if "this court determines Daggett School District is correct," this court should then "transfer the case to the appropriate district court pursuant to rule 44 of the Utah Rules of Appellate Procedure."

¶18 Under rule 44, when a "petition for review is filed in a timely manner but is pursued in an appellate court that does not have jurisdiction in the case, the appellate court, either on its own motion or on motion of any party," will "transfer the case . . . to the court with jurisdiction in the case." Utah R. App. P. 44. In March 2020, this court issued an order "on its own motion to transfer the petition for review pursuant to rule 44." Our order concluded that the petition was "within the jurisdiction of the district court," and the order accordingly transferred the petition to the Eighth District Court.

¶19 When Anderson's petition arrived at the district court, however, the District filed a motion to dismiss for lack of jurisdiction, now asserting that the district court lacked jurisdiction too. Over Anderson's opposition, the district court entered an order in January 2021 dismissing for lack of jurisdiction.

¶20 Anderson timely challenged that decision. Several months after Anderson filed his notice of appeal, the legislature amended the statute that governs appeals from school board decisions. Under the new version of the statute, which was effective as of May 5, 2021, "[a]ny final action or order of the school board may be appealed to the Court of Appeals for review." Utah Code § 53G-11-515(5)(a) (2021).[5]

## ISSUES AND STANDARDS OF REVIEW

¶21 There are two issues before us. The first is whether this court has jurisdiction over Anderson's challenge to his termination. "Whether appellate jurisdiction exists is a question

---

5 . The statute's use of the term "appealed" is potentially problematic. Typically, a decision from a lower court is appealed, while a decision by an administrative entity is challenged by filing a petition for judicial review. These two avenues for appellate court review are similar in many ways, but they are not identical. *See* Utah R. App. P. 18. It may be that the legislature did not use the term "appealed" inadvertently but instead intended to make challenges to "local school board decisions" matters of appeal rather than of judicial review. *See* Utah Code § 78A-4-103(3)(a)(i)(C). If so, the amended statute's designation of such actions as "appeals" may be at odds with the Utah Rules of Appellate Procedure, at least regarding the treatment of interlocutory orders and agency actions. *Compare* Utah R. App. P. 18 (stating that "[r]ules 3 through 8" of the rules of appellate procedure "are not applicable" to "review of decisions or orders of agencies") *with* Utah R. App. P. 5 (allowing for "[d]iscretionary appeals from interlocutory orders"). But even so, the differences between an appeal and a petition for review are not before us in this case, and the order at issue is not interlocutory in any event, so we leave for another day the question of how to resolve any potential implications from this verbiage.

of law." *Acosta v. Labor Comm'n*, 2002 UT App 67, ¶ 9, 44 P.3d 819 (quotation simplified).

¶22   If jurisdiction exists, the next issue is whether the Hearing Officer applied the correct legal standard when reviewing Anderson's termination. This court generally reviews a public employee termination decision for an abuse of discretion. *Perez v. South Jordan City*, 2014 UT App 31, ¶ 24, 320 P.3d 42; *Nelson v. Orem City, Dep't of Public Safety*, 2012 UT App 147, ¶ 16, 278 P.3d 1089. The "choice of legal standard," however, "presents an issue of law that we review for correctness." *Peeples v. Peeples*, 2019 UT App 207, ¶ 11, 456 P.3d 1159.

## ANALYSIS

### I. Jurisdiction

¶23   Anderson challenges the Hearing Officer's decision to uphold his termination. Before reaching the merits of his arguments, however, we must first determine whether we have jurisdiction to consider the matter at all. After all, as a general rule, "we have an independent obligation to ensure that we have jurisdiction over all matters before us, and we do not take lightly our responsibility to ensure we have proper jurisdiction before deciding a case." *11500 Space Center LLC v. Private Capital Group Inc.*, 2022 UT App 92, ¶ 34, 516 P.3d 750 (quotation simplified). And in this case, the District specifically argues that we don't have jurisdiction.

¶24   The jurisdictional question turns on the interplay between two versions of the same statute—one that existed at the time of Anderson's initial petition for review to us (and, also, at the time of the Hearing Officer's decision), and the other that was enacted by the legislature later. At the time of Anderson's initial petition, the controlling statute stated that it did "not limit the right of the

board or the employee to appeal to an appropriate court of law." Utah Code § 53G-11-515(1)(d) (2020) (the Pre-Amendment Statute). But that version of the statute did not identify what an "appropriate court of law" would be. *Id.* In 2021, however, the legislature amended the statute to now state that "[a]ny final action or order of the school board may be appealed to the Court of Appeals for review." Utah Code § 53G-11-515(5)(a) (2021) (the Amended Statute).

¶25 The parties disagree about what we should do with these two versions of this one statute. In Anderson's view, the Amended Statute can and should be applied retroactively as a procedural amendment; in the District's view, however, the Amended Statute is not retroactively applicable. We agree with Anderson.

¶26 "A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive." Utah Code § 68-3-3. And as "a general rule, retroactivity is not favored in the law." *B.A.M. Dev., LLC v. Salt Lake County*, 2006 UT 2, ¶ 20, 128 P.3d 1161 (quotation simplified). But the "rule against retroactivity applies only where a statute implicates substantive laws." *Id.* In this sense, our courts have "long recognized a distinction between substantive and procedural laws as it relates to retroactive application of newly enacted statutes." *Waddoups v. Noorda*, 2013 UT 64, ¶ 8, 321 P.3d 1108. "Laws that enlarge, eliminate, or destroy vested or contractual rights are substantive and are barred from retroactive application absent express legislative intent." *Id.* (quotation simplified). By contrast, laws that "merely pertain to and prescribe the practice and procedure or the legal machinery by which the substantive law is determined or made effective are procedural and may be given retrospective effect." *Id.* (quotation simplified); *see also B.A.M. Dev.*, 2006 UT 2, ¶ 20. Put differently, a "statute is procedural when it provides a remedy for already existing rights or merely adds to or provides a substitute for already existing remedies."

*Docutel Olivetti Corp. v. Dick Brady Sys., Inc.*, 731 P.2d 475, 478 (Utah 1986).

¶27   The statute at issue—the Amended Statute—is a jurisdictional statute that affirmatively states that this court has jurisdiction to hear an appeal from a termination decision involving a teacher. With regard to jurisdictional statutes and retroactivity, the United States Supreme Court has held that if an amended statute "*creates* jurisdiction where none previously existed," it "speaks not just to the power of a particular court but to the substantive rights of the parties as well." *Hughes Aircraft Co. v. United States ex. rel. Schumer*, 520 U.S. 939, 951 (1997) (emphasis in original). Thus, "such a statute, even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other." *Id.* (quotation simplified). By contrast, "statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties." *Id.* (emphasis in original, quotation otherwise simplified). Such statutes are regarded as procedural because they "affect only *where* a suit may be brought, not *whether* it may be brought at all." *Id.* (emphasis in original). In our view, this framework is consistent with the approach taken by Utah courts to the procedural-versus-substantive retroactivity dynamic in general. And under this construct, we conclude that the Amended Statute was procedural, rather than substantive, because the Pre-Amendment Statute had already recognized that there was a right to judicial review of a termination decision.

¶28   An appellate court's "primary goal" in "interpreting statutory language" is to "give effect to the legislature's intent." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 33, 267 P.3d 863. And here, both parties seem to agree that the jurisdictional question before us largely starts with the language of the Pre-Amendment Statute. Again, that statute stated that it did "not

limit the right of the board or the employee to appeal to an appropriate court of law," Utah Code § 53G-11-515(1)(d) (2020), but it did not then identify what an "appropriate court of law" would be. This is something of a curious omission. In Anderson's view, however, the statute as a whole still implied that *some* court had jurisdiction, while the District asserts that this omission meant that *no* court had jurisdiction.

¶29    We agree with Anderson. "Not every gap in the law is a purposeful omission. Some gaps are just gaps—to be filled in later, as by the exercise of common-law power or the inherent power of a court." *Davis County v. Purdue Pharma, LP*, 2020 UT 17, ¶ 13, 463 P.3d 619. In *MacDonald v. MacDonald*, 2018 UT 48, ¶¶ 32–33, 430 P.3d 612, our supreme court held that when a governing statute is "underdeterminate"—that is, the statute "articulates the governing standard" and "identifies the relevant timeframe," but doesn't identify "what information to consider in deciding" the issue—a court "can answer that question" by "resorting to a body of case law."

¶30    Like Anderson, we think that the most natural reading of the Pre-Amendment Statute is that it was simply underdeterminate as to the question of which court had jurisdiction to review a termination decision involving a teacher. After all, the statute stated at the outset that it was not limiting "the *right* of the board or the employee to appeal" a termination decision. Utah Code § 53G-11-515(1)(d) (2020) (emphasis added). If the legislature thought that no such right even existed, there would have been little reason for it to have created a statutory hedge to protect against the impairment of this non-existent right.

¶31    Moreover, if the legislature thought that no court had jurisdiction to review a termination decision, there also would have been little reason for it to have stated that it was not "limit[ing] the right of the board or the employee to appeal to *an appropriate court of law*." *Id.* (emphasis added). Again, the District's

view is that no court could hear such disputes. In light of this, the District is essentially assuming that the statute's reference to "an appropriate court of law" was an affirmative reference by the legislature to an entity that the legislature didn't think existed.

¶32 The "canon of independent meaning" and "its converse, the presumption against surplusage," both communicate "a reluctance to attribute to the legislature the intent to adopt a nullity—to enact a provision that says nothing not already stated elsewhere." *Lancer Ins. Co. v. Lake Shore Motor Coach Lines, Inc.*, 2017 UT 8, ¶ 13, 391 P.3d 218. Put differently, "it seems hard to attribute to the legislature the intent to adopt a statutory mandate that has no operative effect." *Id.* ¶ 14.

¶33 While the canons of interpretation aren't infallible, they are, of course, routinely employed by courts as interpretive guides. *See Croft v. Morgan County*, 2021 UT 46, ¶ 21, 496 P.3d 83 (noting that the canons "are not formulaic, dispositive indicators of statutory meaning but merely guide our construction of statutes in accordance with common, ordinary usage and understanding of language" (quotation simplified)). Here, rather than assuming that the legislature made a statutory reference to a non-existent "right" to appeal to a non-existent "appropriate court of law," the more natural reading is the one offered by Anderson—namely, that the legislature contemplated that jurisdiction did exist with some court, even though there was a gap in the statute as to which court could hear such appeals.

¶34 Our reading of the Pre-Amendment Statute also finds support in the absurdity canon. The "absurd consequences canon . . . resolves an ambiguity by choosing the reading that avoids absurd results." *Bagley v. Bagley*, 2016 UT 48, ¶ 27, 387 P.3d 1000 (quotation simplified). "In defining the parameters of what constitutes an absurd result, we have noted that such a result must be so absurd that the legislative body which authored the

legislation could not have intended it." *Marion Energy*, 2011 UT 50, ¶ 26 (quotation simplified).

¶35 In his brief, Anderson points to an array of public employees who have a statutory right to some form of judicial review of a termination decision. For example, he points out that municipal government employees have the right to such review, as do peace officers, sheriffs, and firefighters. *See* Utah Code § 10-3-1106(6) (municipal employees); *id.* § 17-30a-404 (peace officers); *id.* § 17-30-20 (sheriffs); *id.* § 17-28-13 (firefighters). When this issue arose at oral argument, the District couldn't point to any other kind of career public employee who *doesn't* have such a right; instead, the District asserted that "teachers were a category of their own" in this respect up until the time of the Amended Statute. Indeed, the District asserted this would have been true even if a teacher was fired for a transparently unlawful reason. In response to a question about this, the District argued that even if a teacher was fired for racially discriminatory reasons, for example, the teacher's only recourse would have been to sue the school district for damages, but that the teacher would have had no right to ask a court to review the termination decision itself.

¶36 We can see no reason, and the District has given us none, why the legislature would have believed that teachers (and teachers alone) should not have the right to judicial review of an adverse employment decision—even if it was based on a transparently unlawful reason—nor do we see any reason why the legislature would have preferred to have teachers (and teachers alone) be forced to instead file damage suits from the outset. Given this, the absurdity canon likewise suggests that the District's reading of the Pre-Amendment Statute is simply incorrect.

¶37 In short, given the Pre-Amendment Statute's reference to the "right" to appeal and an "appropriate court," as well as the problems of surplusage and absurdity that follow from the

District's reading of that statute, we have no hesitancy in concluding that Anderson had a right to judicial review of his termination decision even before the Amended Statute. In light of this, we likewise conclude that the Amended Statute "affect[ed] only *where* [the] suit may be brought, not *whether* it may be brought at all." *Hughes Aircraft*, 520 U.S. at 951 (emphasis in original). As a result, that statute can be retroactively applied to this case. And since that statute provides that "[a]ny final action or order of the school board may be appealed to the Court of Appeals for review," Utah Code § 53G-11-515(5)(a) (2021), this means that we have jurisdiction to consider Anderson's challenge to the Hearing Officer's decision.

¶38   We acknowledge, of course, that in our March 2020 order, we acted "on [our] own motion" and "transfer[red] the petition for review" to the district court pursuant to rule 44. With the benefit of full briefing and argument in this appeal, as well as the legislature's subsequent action, we now conclude that this order should be withdrawn. Again, the Pre-Amendment Statute recognized a "right" to judicial review and referred to an "appropriate court of law," thus contemplating that *some* court had jurisdiction—but this is at odds with the position taken by the District after our transfer, wherein the District asserted that *no* court had jurisdiction. Moreover, to the extent that there was any lingering question about which court was an "appropriate court" to conduct this review, our legislature has since passed the Amended Statute and has now explicitly stated that this court is the appropriate court to review such cases. Since we've now concluded that the Amended Statute is retroactively applicable, we accordingly vacate our prior order and hold that this matter is within our jurisdiction. *Cf. Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 34 n.3, 70 P.3d 47 (acknowledging that while the court of appeals made a "valiant attempt to account for" an order that transferred a case from the Utah Supreme Court, the supreme

court had "incorrectly transferred it to" the court of appeals "in the first place").

## II. Governing Legal Standard

¶39 Applying a standard that it borrowed from federal due process cases, the Hearing Officer held that Anderson was required to "demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Citing Hays v. Park City School Dist.*, 214 F. Supp. 3d 1162, 1182 (D. Utah 2016) (quotation simplified). Under that standard, the Hearing Officer then upheld Anderson's termination because, in the Hearing Officer's view, the decision did not "shock the conscience and did not unlawfully deprive [him] of any substantive rights."

¶40 Anderson now argues that the Hearing Officer applied the wrong standard. In Anderson's view, the Hearing Officer should have instead reviewed the case under the consistency and proportionality standard. We agree with Anderson.[6]

¶41 The Hearing Officer based his choice-of-standard decision on his observation that "[c]ases in Utah are relatively scant on employment law specifically involving the termination of educators." That very narrow observation was true. But even so, teachers are public employees. And when assessing whether a public employee's "misconduct warrant[ed]" a particular "sanction[]," this court had, at the time of Anderson's hearing,

---

6. As noted, we review the Hearing Officer's ultimate decision under the abuse of discretion standard. But the "choice of legal standard . . . presents an issue of law that we review for correctness." *Peeples v. Peeples*, 2019 UT App 207, ¶ 11, 456 P.3d 1159. And it's well settled that applying the wrong legal standard constitutes an abuse of discretion. *See, e.g., Johnson v. Johnson*, 2014 UT 21, ¶ 24, 330 P.3d 704.

"divided the inquiry into two prongs: (1) Is the sanction proportional? and (2) Is the sanction consistent with previous sanctions imposed by the department pursuant to its own policies?" *Burgess v. Department of Corr.*, 2017 UT App 186, ¶ 35, 405 P.3d 937 (quotation simplified).

¶42    Of note, we had applied that standard to many different kinds of public employees. In *Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶¶ 1, 7, 116 P.3d 973, for example, we reviewed a decision from the Ogden Civil Service Commission that had reversed Ogden City's decision to terminate a fire captain. After noting that our own review is for an abuse of discretion, *id.* ¶ 9, we concluded that there had been an abuse of discretion below because of certain errors in the Commission's process, *id.* ¶¶ 9–16. We then remanded the matter with instructions for the Commission to determine whether the sanction of dismissal was "(1) appropriate to the offense and (2) consistent with previous sanctions imposed by the department." *Id.* ¶¶ 16, 19. In *Leavitt v. Salt Lake City Corp.*, 2019 UT App 70, 442 P.3d 1217, we reviewed the Salt Lake City Civil Service Commission's affirmance of a police officer's termination. In doing so, we noted that the Civil Service Commission should have reviewed the termination for proportionality and consistency, while we would then review that decision for an abuse of discretion. *Id.* ¶¶ 14–17. Other cases involving public employees likewise recognized that the proportionality and consistency standard applied to the initial review of a disciplinary action against a public employee. *See, e.g.*, *Macfarlane v. Career Service Review Office*, 2019 UT App 133, ¶¶ 44–46, 450 P.3d 87 (department of public safety employee); *Perez v. South Jordan City*, 2014 UT App 31, ¶ 24, 320 P.3d 42 (police officer); *Hugoe v. Woods Cross City*, 2013 UT App 278, ¶¶ 12–15, 316 P.3d 979 (mechanic employed by a city); *Sorge v. Office of Att'y Gen.*, 2006 UT App 2, ¶¶ 26–32, 128 P.3d 566 (assistant attorney general); *Lunnen v. Utah Dep't of Transp.*, 886 P.2d 70, 72 (Utah Ct. App. 1994) (department of transportation employee).

¶43     It's true that none of these cases involved the termination of a teacher. And it's also true, as the District points out, that teachers are excluded from some portions of the Utah Administrative Procedures Act (UAPA). But even so, we see nothing in the Utah Code or in any case that established that the termination of a teacher was reviewed under something other than this well-worn common law standard, and the District has given us no reason to conclude that there was such a difference. Indeed, we note that both sides below framed much of their arguments to the Hearing Officer around the question of whether Anderson's termination was "proportional" to his offenses and "consistent" with discipline that other employees in similar situations had received. In light of all this, we disagree with the Hearing Officer's conclusion that Anderson was required to satisfy a higher "shocks the conscience" standard. Instead, we conclude that the proper question was whether Anderson's termination was proportionate and consistent.

¶44     In anticipation of this potential outcome, the District suggests in its brief that we may alternatively affirm Anderson's termination on the basis that the Hearing Officer actually did apply this standard. And here, we acknowledge that the Hearing Officer did hear "argument and testimony on proportionality and consistency" and that the Hearing Officer fleetingly mentioned proportionality in his written decision (though he did not mention consistency).

¶45     But even so, the Hearing Officer's decision as a whole was largely framed around his assessment of whether the termination "shock[ed] the conscience" under the *Hays* test. "Where an incorrect legal standard is applied to the facts of a case, we may reverse and remand for further proceedings consistent with our opinion." *Jensen Tech Services v. Labor Comm'n*, 2022 UT App 18, ¶ 16, 506 P.3d 616 (quotation simplified); *see also Schroeder v. Utah Att'y Gen.'s Office*, 2015 UT 77, ¶ 54, 358 P.3d 1075 (remanding a case where the district court's "incorrect interpretation of the law"

"drove the district court's analysis"); *Northgate Village Dev. LC v. Orem City*, 2018 UT App 89, ¶ 21, 427 P.3d 391 (reversing and remanding after concluding that the district court "abused its discretion" when it "based its determination on an incorrect interpretation of the law"). Here, the Hearing Officer began with a detailed description of *Hays*'s "shocks the conscience" standard. The Hearing Officer then noted that "[w]hile it could be legitimately argued that a superintendent in a separate school district may have opted to issue progressive discipline to Mr. Anderson under the same circumstances, based on the factual record, the action of [Superintendent] to recommend termination was not shocking to the conscience"—a statement that belies the District's assertion that the Hearing Officer was actually applying a standard that turned, in part, on consistency. And at the end of his ruling, the Hearing Officer concluded that "[t]he decision to terminate Mr. Anderson does not shock the conscience" and that the District therefore "did not unlawfully deprive Mr. Anderson of any substantive rights."

¶46    Again, applying the wrong legal standard constitutes an abuse of discretion. Because the Hearing Officer applied the wrong standard, and because that standard seems to have driven his analysis, we set aside his decision and instruct him to reassess Anderson's termination under the proportionality and consistency standard.[7]

---

7. We've decided above that under the common law that existed at the time of Anderson's hearing, the Hearing Officer should have reviewed Anderson's termination for proportionality and consistency.

    We do note one potential wrinkle that we are not deciding. At oral argument, the District pointed out that in the same set of 2021 statutory amendments discussed above (i.e., the amendments that added language stating that the court of appeals

(continued…)

CONCLUSION

¶47 We first conclude that the Pre-Amendment Statute included a right for teachers to seek judicial review of a termination decision made by a school district or hearing officer. We next determine that because the additional language set forth in the Amended Statute was procedural in nature, it applies retroactively to Anderson's case. And under the terms of that statute, we have jurisdiction to consider Anderson's challenge to the Hearing Officer's decision.

---

has jurisdiction over discipline decisions involving teachers), the legislature added a separate provision stating that the court of appeals' review "shall be for the purpose of determining whether the school board exceeded the school board's discretion, or the school board exceeded the school board's authority." Utah Code § 53G-11-515(5)(c)(ii) (2021). At oral argument, the District surmised that this new reference to a "school board's discretion" might somehow change the nature of a hearing officer's inquiry. But the District didn't develop any such argument in its brief, nor did it brief the question of whether any such change would be retroactively applicable. Indeed, after highlighting this potential issue at oral argument, the District said that it is *not* asking this court to decide this issue in this case and then asked us to avoid opining on it. When Anderson's counsel was asked about this in rebuttal, she likewise agreed that we only need to decide whether the proportionality and consistency standard applied at the time of Anderson's hearing. In the absence of any direct briefing by the parties on this potential argument (much less a request for a ruling on it), we leave it for another day. Instead, we simply hold here that the Hearing Officer did not apply the correct standard that applied at the time, and because the application of that standard to Anderson's termination is best addressed by the Hearing Officer in the first instance, we set aside that decision on that basis alone.

¶48    We further conclude that the Hearing Officer improperly assessed Anderson's termination under a "shocks the conscience" framework and that he should have instead assessed the termination for proportionality and consistency. We therefore instruct the Hearing Officer to revisit Anderson's case and make a new determination under the correct standard.

—————